

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-24-1996

# ACLU NJ v. Black Horse Pike Regional Bd. of Education

Precedential or Non-Precedential:

Docket 94-5233

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"ACLU NJ v. Black Horse Pike Regional Bd. of Education" (1996). *1996 Decisions.* Paper 182.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/182

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 94-5233


THE AMERICAN CIVIL LIBERTIES UNION OF NEW JERSEY,
ON BEHALF OF ITS MEMBERS; AND EDWARD ROSS

v.

BLACK HORSE PIKE REGIONAL BOARD OF EDUCATION;
HIGHLAND REGIONAL HIGH SCHOOL; FRANK PALATUCCI,
PRINCIPAL IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES

Appellants


On Appeal From the United States District Court
for the District of New Jersey
(D.C. Civ. No. 93-cv-02651)


Argued: January 23, 1995

Before: MANSMANN, HUTCHINSON and McKEE, Circuit Judges.


Reargued In Banc: October 25, 1995

Before: SLOVITER, Chief Judge, BECKER, STAPLETON,
MANSMANN, GREENBERG, SCIRICA, COWEN, NYGAARD, ALITO,
ROTH, LEWIS, McKEE, and SAROKIN, Circuit Judges.

(Filed May 24, 1996)

JAMES KATZ, ESQUIRE (ARGUED)
Tomar, Simonoff, Adourian & O'Brien
41 South Haddon Avenue
Haddonfield, NJ  08033
        Counsel for Appellees

JOHN D. WADE, ESQUIRE (ARGUED)
Ferreri & Wade, P.C.
1250 Chews Landing Road
Laurel Springs, NJ  08021
        Counsel for Appellants

OPINION OF THE COURT


McKEE, Circuit Judge.

We are asked to decide whether a policy adopted by the Black Horse Pike Regional Board of Education that allows a vote of the senior class to determine if prayer will be included in high school graduation ceremonies is constitutional.  For the reasons that follow we hold that this policy is inconsistent with the First Amendment of the United States Constitution.  Accordingly, we will affirm, but modify, the permanent injunction issued by the district court.


I. FACTUAL BACKGROUND

The Black Horse Pike Regional Board of Education (the "School Board" or "Board") has had a longstanding tradition of including a nonsectarian invocation and benediction in high school graduation ceremonies.  These prayers have historically been delivered by local clergy on a rotating basis in an attempt to afford different denominations the opportunity to be represented.

In May of 1993, the School Board decided to reconsider this policy because of the Supreme Court's decision in Lee v. Weisman, 505 U.S. 577 (1992), wherein the Court invalidated a public school's practice of including prayer in graduation ceremonies.  As part of the Board's reexamination, the Superintendent of Schools tendered a policy entitled "Religion at Graduation Exercises" IKFD ("Version A") for the Board's consideration.  Version A prohibited all prayer at graduation ceremonies.  The Board rejected that policy and directed the school administration to prepare a second version that would parallel the holding of Jones v. Clear Creek Indep. Sch. Dist., 977 F.2d 963, 972 (5th Cir. 1992).  The court in Jones had upheld a public school policy that allowed students to determine for themselves whether or not a prayer would be delivered at their graduation.

Two policies were presented to the Board at its May 23, 1993 meeting.  One version allowed graduating students to decide whether prayer would be included in the graduation ceremony as well as the nature of any such prayer ("Version D").  The other proposal would not have allowed "prayer" but would have allowed a "moment of reflection, during which pupils and parents [could] be asked to think silently about what has been and what is to come for each graduate."  App. at 144.  A group of students who had previously asked to address the Board on this issue attended the meeting and spoke in favor of Version D.  At the conclusion of the meeting, the Board unanimously adopted Version D.  That policy, as finally adopted, allowed the senior class officers to conduct a poll of the graduating class to determine whether seniors wanted "prayer, a moment of reflection, or nothing at all" to be included in their graduation ceremony.  App. at 180.  The policy was entitled, "Religion at Graduation Exercises," and the text began as follows:

> After reading recent decisions of the United States Supreme Court and interpretations of those decisions, the Board of Education concludes the long standing practice of conducting invocation and benediction prayer at graduation ceremonies and at other school functions is proper and legal under the following conditions:
>
> 1.   The Board of Education, administration and staff of the schools shall not endorse, organize or in any way promote prayer at school functions.
>
> 2.   In the spirit of protected speech, the pupils in attendance must choose to have prayer conducted. Such prayer must be performed by a student volunteer and may not be conducted by a member of the clergy or staff.

Policy IKFD, Version D, App. at 180.

The policy also allowed the students to decide how they would determine what form of prayer, if any, would be given at graduation, "so long as the process [was] conducted by duly elected class officers and the survey . . . provides pupils with an opportunity to choose prayer, a moment of reflection, or nothing at all."  Version D of Policy IKFD further required that printed programs for the graduation include a disclaimer explaining that any presentation that may be given at commencement did not reflect the views of the School Board, the School District, administrators, staff, or other students.

On June 3, 1993, Principal Frank Palatucci of the Highland Regional High School explained the Board's decision to the students during the morning announcements over the school public address system.  After he explained the policy, he introduced the senior class president who explained that a poll would be taken of the senior class, and how the balloting would be conducted. The vote was taken the next day and produced the following results: 128 students voted for prayer, 120 for reflection/moment of silence, and 20 voted to have neither.  Students then volunteered to deliver the graduation prayer, and the senior class officers selected the senior class recording secretary from among those volunteers.

On June 9, Edward Ross, a member of the senior class, approached Principal Palatucci and requested that a representative from the ACLU also be permitted to speak at the graduation to discuss safe sex and condom distribution. Principal Palatucci denied Ross' request explaining that the time constraints of the ceremony would not permit a keynote speaker, and that the topic requested was not generally one discussed at graduation ceremonies.

## II. PROCEDURAL HISTORY

On June 18, 1993, the ACLU and Edward Ross filed a Complaint in the District Court for the District of New Jersey, in which they asked the court to enjoin any student-led prayer at graduation. The Complaint alleged that the proposed prayer violated the First Amendment of the United States Constitution and Article I, Paragraph 4 of the New Jersey Constitution.

By Order entered June 24, 1993, the district court denied plaintiffs' request for a preliminary injunction. The court concluded that the proposed prayer was appropriate because it was given under circumstances that distinguished it from the prohibited prayer in Lee v. Weisman. The following day the plaintiffs filed an emergency appeal to this court where a two-judge panel reversed the district court and entered an order that stated in part:

> [T]he graduation ceremony is a school sponsored event; the fact that the school board has chosen to delegate the decision regarding one segment of the ceremony to the members of the graduating class does not alter that sponsorship, does not diminish the effect of a prayer on students who do not share the same or any religious perspective, and does not serve to distinguish, in any material way, the facts of this case from the facts of Lee v. Weisman,    U.S.   , 112 S. Ct. 2649 (1992);
>
> . . .
>
> Now, therefore, . . . appellees, their agents and employees, and all those acting in concert with them are hereby enjoined from conducting a school sponsored graduation ceremony that includes a prayer whether it be an invocation, a benediction or a prayer in any other form.

App. at 199-200.

Thereafter, the School Board filed a motion in this court to vacate the preliminary injunction. That motion was denied. Additional motions were subsequently filed both in this court and in the United States Supreme Court. Finally, on March 29, 1994, the district court entered a final order, consistent with the aforementioned order of this court, reversing the court's previous denial of the preliminary injunction. The district court permanently enjoined the School Board from "conducting a school-sponsored graduation ceremony that include[d] prayer, whether it be an invocation, a benediction or a prayer in any other form." App. at 210. On April 28, 1994, the School Board filed this appeal. The matter is now before this court in banc.

### III. OUR SCOPE OF REVIEW

We review a district court's decision to grant or deny a permanent injunction under an abuse of discretion standard. International Union, UAW v. Mack Trucks, Inc., 820 F.2d 91, 94

(3d Cir. 1987). "An abuse of discretion exists where the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." Id. at 95.

In this case, the district court did not render a decision on the merits as to whether plaintiffs were entitled to a permanent injunction. Instead, the district court granted a permanent injunction solely because it believed it was bound to do so by the law of the case in light of the emergency ruling of a two-judge panel of this court granting plaintiffs' motion for a preliminary injunction. As the district court expressly stated in its order:

> Additional hearings or new evidence might have put a different cast on the issues, but as the record has not been augmented since the motion for a preliminary injunction, we feel constrained to enter a final judgment in accordance with the Third Circuit's order of June 25, 1993. We make it clear that the opinion of the Court remains that expressed in the oral opinion of June 24, 1993. However, due regard for our "hierarchical federal judicial system," particularly where the reviewing panel has had the same record as the Court, requires us to respect the findings of the Third Circuit.

Order of March 29, 1994, at 3 (citations omitted).

The district court erred in concluding that it was so bound. The two-judge panel assessed the merits on an emergency basis under the standard for the granting of a preliminary injunction -- a standard which differs from the standard for granting a permanent injunction. Its decision to grant a preliminary injunction was based on an assessment of the likelihood that plaintiffs would succeed on the merits, and neither constitutes nor substitutes for an actual finding that plaintiffs havesucceeded on the merits and are entitled to permanent relief.
Indeed, there is no evidence in the record that the district court ever applied the legal standard for granting a permanentinjunction or otherwise based its decision upon an assessment of the merits of the case.

It is well-established, however, that "if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason." Helvering v. Gowran, 302 U.S. 238, 245 (1937); see also Erie Telecommunications, Inc. v. City of Erie, 853 F.2d 1084, 1089 n.10 (3d Cir. 1988). We will therefore proceed to address the merits of this matter to determine whether, despite the district court's error, the permanent injunction was properly issued on some other ground.

## IV.  DISCUSSION
### A. The Free Speech Rights of Students

The Board relies upon the student referendum in an attempt to define the instant controversy as one impacting upon the

students' right of free speech as opposed to a dispute over the constitutionality of prayer at a public high school graduation. Version D of Policy IKFD does state: "[i]n the spirit of protected free speech, the pupils in attendance must choose to have prayer conducted," App. at 180. However, Version D allowed the 128 seniors who wanted verbal prayer at their graduation to impose their will upon 140 of their fellow classmates who did not. The Board's position would have us recognize a right in that plurality to do so, and ignore the right of others to worship in a different manner, or in no manner at all. This we can not do because "the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all." Wallace v. Jaffree, 472 U.S. 38, 52 (1985). Therefore, the Board's emphasis on voting majorities is misplaced. "While in some societies the wishes of the majority might prevail, the Establishment Clause of the First Amendment is addressed to this contingency and rejects the balance urged upon us." Lee, 505 U.S. at 596.

> Just as the right to speak and the right to refrain from speaking are complementary components of a broader concept of individual freedom of mind, so also the individual's freedom to choose his own creed is the counterpart of his right to refrain from accepting the creed established by the majority.

Wallace, 472 U.S. at 52.

An impermissible practice can not be transformed into a constitutionally acceptable one by putting a democratic process to an improper use. There should be no question "that the electorate as a whole, whether by referendum or otherwise, could not order [governmental] action violative of the [Constitution], and the [government] may not avoid the strictures of [the Constitution] by deferring to the wishes or objections of some fraction of the body politic." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 448 (1985) (citation omitted). A policy that does this can not be legitimized by arguing that it promotes the free speech of the majority.

> The First Amendment protects speech and religion by quite different mechanisms. Speech is protected by insuring its full expression . . . . The method for protecting freedom of worship and freedom of conscience in religious matters is quite the reverse. . . . The Free Exercise Clause embraces a freedom of conscience and worship that has close parallels in the speech provisions of the First Amendment, but the Establishment Clause is a specific prohibition on forms of state intervention in religious affairs with no precise counterpart in the speech provisions.

Lee, 505 U.S. at 591.

Although it is necessary to reconcile one's own preferences to the results of a referendum when choosing one's representatives or voting upon legislative matters, the First Amendment does not allow one's religious preferences to be compromised in this manner.

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's . . . fundamental rights may not be submitted to vote; they depend on the outcome of no elections.

Board of Educ. v. Barnette, 319 U.S. 624, 638 (1943).

High school graduation ceremonies have not been regarded, either by law or tradition, as public fora where a multiplicity of views on any given topic, secular or religious, can be expressed and exchanged. School officials at Highland did not allow a representative of the ACLU to speak about "safe sex" and condom distribution at graduation, as requested by one of the graduating seniors. The question was not submitted to referendum of the graduating seniors because the principal understandably determined that the proposed topic was not suitable for graduation. We do not suggest that the school's response to this request was inappropriate. However, we do note that the response illustrates the degree of control the administration retained over student speech at graduation. Version D was not intended to broaden the rights of students to speak at graduation, nor to convert the graduation ceremony into a public forum. Cf. Capitol Square Review and Advisory Bd. v. Pinette, U.S. , 115 S. Ct. 2440, 2450 (1995) ("Religious expression cannot violate the Establishment Clause where it (1) is purely private and (2) occurs in a traditional or designated public forum, publicly announced and open to all on equal terms.").

Accordingly, we fail to see how this particular policy, addressed only to providing an option for continuing prayer at graduation after Lee, can be legitimized as promoting the free speech rights of the students.

### B. Lee v. Weisman

The degree of control that school officials retained over the speech that would be permitted at graduation is also relevant under Lee v. Weisman, 505 U.S. 577 (1992). There, the principal of a public middle school invited a rabbi to deliver the invocation and benediction at the school's graduation, in accordance with school district practice. The principal gave the rabbi a pamphlet containing guidelines to be followed in giving public prayers at civic occasions and told the rabbi that the prayers should be non-sectarian. Id. at 581. The graduation ceremony at which the prayers were given was held on school property, and the parties stipulated that attendance at the

ceremony was voluntary.  After the processional, the students remained standing for the Pledge of Allegiance, and for the rabbi's very brief invocation.

In ruling the prayer unconstitutional, the Supreme Court emphasized:

> These dominant facts mark and control the confines of our decision: [1] State officials direct the performance of a formal religious exercise at promotional and graduation ceremonies for secondary schools. [2] Even for those students who object to the religious exercise, their attendance and participation in the state sponsored religious activity are in a fair and real sense obligatory, though the school district does not require attendance as a condition for receipt of the diploma.

Id. at 586.  Accordingly, we must examine (1) the state's control of the graduation ceremony, and (2) the students' coerced participation in the ceremony here.

(1)

The School Board argues that the student referendum here significantly distinguishes this case from Lee.  We disagree.  It is, of course, true that the state's entanglement with the graduation prayer in Lee was more obvious, pronounced, and intrusive than the School District's involvement here.  In Lee, the principal decided prayer would be included in the ceremony, chose the clergy person who would give the prayer, and even determined part of the content of the prayer by giving the invited clergy guidelines for the substance of the prayer.  Id.at 587.  It is no wonder then, that the resulting prayer "bore the imprint of the State."  Id. at 590.

Although the state's involvement here is certainly less evident, the student referendum does not erase the state's imprint from this graduation prayer.  Graduation at Highland Regional High School, like graduation at nearly any other school, is a school sponsored event.  School officials decide the sequence of events and the order of speakers on the program, and ceremonies are typically held on school property at no cost to the students. App. at 118-26.  The atmosphere at Highland's graduations is characterized by order and uniformity.  School officials necessarily "retain a high degree of control over the precise contents of the program, the speeches, the timing, the movements, the dress, and the decorum of the students."  Lee, 505 U.S. at 597.  Principal Palatucci testified before the district court that any student who attempted to give an unscheduled address at graduation in contravention of administrative direction would be arrested if police were available, even if a majority of the graduating students had previously approved.  The district court carefully questioned the principal about what he would do if a majority of the student body, without administrative approval, voted to have a speaker who would not be included in the program but would be introduced by the valedictorian and allowed to give a one minute speech.  The

principal responded: "I couldn't allow that to happen. . . . If I have a police officer, I have her arrested." App. at 125. Thus, the school officials' involvement and control is not as limited, unintrusive, or neutral as the School Board suggests.

Delegation of one aspect of the ceremony to a plurality of students does not constitute the absence of school officials' control over the graduation. Students decided the question of prayer at graduation only because school officials agreed to let them decide that one question. Although the delegation here may appear to many to be no more than a neutral means of deciding whether prayer should be included in the graduation, it does not insulate the School Board from the reach of the First Amendment. "[C]ourts must keep in mind both the fundamental place held by the Establishment Clause in our constitutional scheme and the myriad, subtle ways in which the Establishment Clause values can be eroded." Lynch v. Donnelly, 465 U.S. 668, 694 (1984) (O'Connor, J., concurring).

Furthermore, the text of Version D affirms that it was adopted in response to Lee. The Board's avowed purpose in reexamining its policy was to provide an option that might allow the "longstanding tradition" of graduation prayer to survive the prohibitions of that Supreme Court decision. We believe that the control exercised by state officials here, though different in degree than was present in Lee, is not sufficiently distinct to require a different result under the "first dominant fact" of Lee.

(2)

"[T]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." Lee. 505 U.S. at 592. We find no difference whatsoever between the coercion in Lee and the coercion here. A high school graduation is distinguishable from forums such as a legislative session where prayer has been upheld. See Marsh v. Chambers, 463 U.S. 783, 795 (1983). Legislators "may presumably absent themselves from such public and ceremonial exercises without incurring any penalty, direct or indirect." School Dist. of Abington Twnshp v. Schempp, 374 U.S. 203, 299–300 (1963) (Brennan, J., concurring). The same cannot be said of students at their high school graduation.

"The fact that attendance at the graduation ceremonies is voluntary in a legal sense does not save the religious exercise." Lee, 505 U.S. at 596. The objector's presence at his or her graduation compels participation in the religious observance decreed by the results of the poll that is sanctioned under Version D. This, the Constitution does not allow.

> What to most believers may seem nothing more than a reasonable request that the nonbeliever respect their religious practices, in a school context may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy.
>
> . . . The undeniable fact is that the

> school district's supervision and control of
> a high school graduation ceremony places
> public pressure, as well as peer pressure, on
> attending students to stand as a group or, at
> least, maintain respectful silence during the
> Invocation and Benediction.  This pressure,
> though subtle and indirect, can be as real as
> any overt compulsion. . . . [F]or the
> dissenter of high school age, who has a
> reasonable perception that she is being
> forced by the State to pray in a manner her
> conscience will not allow, the injury is . .
> . real.

Id. at 592-93.  Even the appearance of participation should be avoided in this setting.  Id. at 588 (students "had no real alternative which would have allowed [them] to avoid the fact or appearance of participation").

Here, the hypothetical dissenter in Lee is replaced by 140 students who voted not to have a formal prayer at their public high school graduation.  The Board's policy would have required each of those 140 students to participate (or at the very least maintain respectful silence) as others engaged in student-led worship.  "It is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise."  Id. at 587.  Here, as in Lee, "[t]he prayer exercises . . . are especially improper because the State has in every practical sense compelled attendance and participation in an explicit religious exercise at an event of singular importance to every student, one the objecting student had no real alternative to avoid."  Id. at 598.  Students at Highland had to either conform to the model of worship commanded by the plurality or absent themselves from graduation and thereby forego one of the most important events in their lives.  That is an improper choice to force upon dissenting students.

> [T]o say a teenage student has a real choice
> not to attend her high school graduation is
> formalistic in the extreme. . . . Everyone
> knows that in our society and in our culture
> high school graduation is one of life's most
> significant occasions.  A school rule which
> excuses attendance is beside the point.

Id. at 595.  "The Constitution forbids the State to exact religious conformity from a student as the price of attending his own high school graduation."  Id. at 596.

The First Amendment is a shield that prohibits the state from interfering with a person's right to worship as he or she pleases.  It is not a sword that can be used to compel others to join in a religious observance at a state sponsored event.  "The First Amendment has lost much if the religious follower and the atheist are no longer to be judicially regarded as entitled to equal justice under law."  Zorach v. Clauson, 343 U.S. 306, 320

(1952) (Black, J., dissenting).

> The sole question presented is whether a religious exercise may be conducted at a graduation ceremony in circumstances where . . . young graduates who object are induced to conform. No holding by th[e Supreme Court] suggests a school can persuade or compel a student to participate in a religious exercise. That is being done here, and it is forbidden by the Establishment Clause of the First Amendment.

Lee, 505 U.S. at 599.

It is, of course, true that the often referenced "wall of separation" between church and state has recently been described as more "metaphor" than reality. However, even if the "wall" is more metaphor than mortar, it is sufficiently unyielding to prevent prayer from being included as a formal part of the graduation ceremony under Version D of Policy IKFD.

The disclaimer required under Version D does help to recapture some of the separation between church and state that has been obscured by the state's control over the graduation. However, the Board cannot sanction coerced participation in a religious observance merely by disclaiming responsibility for the content of the ceremony. Given the protections inherent in the First Amendment, it is quite possible that parents of some graduating seniors chose public education precisely so that their children would not be compelled to follow the religious beliefs of others. Yet, that is exactly what Version D allows.

We recognize that the Court of Appeals for the Fifth Circuit has reached a result contrary to the one we reach today. See Jones v. Clear Creek Indep. Sch. Dist., 977 F.2d 963 (5th Cir. 1992), cert. denied, 113 S. Ct. 2950 (1993). Indeed, as stated earlier, the administration at Highland promulgated Version D pursuant to the Board's instruction to develop a policy that would parallel the holding of Jones. We are not, however, persuaded by that court's analysis. Jones also involved a challenge to a policy that allowed students to decide if they wanted prayer at a public school's graduation ceremony. The Jones court upheld the policy while acknowledging that "the practical result of [its] decision, viewed in light of Lee, is that a majority of students can do what the State acting on its own cannot do to incorporate prayer in public high school graduation ceremonies." Id. at 972.

That court recently reaffirmed that ruling in Ingebretsen v. Jackson Public Sch. Dist., No. 94-60631, 1996 WL 205, *6 (5th Cir. Jan. 10, 1996) (affirming an order that enjoined enforcement of a Mississippi statute allowing prayer at compulsory and noncompulsory school events, "except as to nonsectarian, nonproselytizing student initiated voluntary prayer at high school commencement as condoned by Jones . . . ."). In Doe v. Duncanville Indep. Sch. Dist., 70 F.3d 402 (5th Cir. 1995), the court again addressed the limits of school prayer in public

schools, but in the context of extra-curricular activities for which students received academic credit. The court held that the school district's practice of allowing its employees to initiate or merely participate in prayers at basketball games and basketball practices was unconstitutional. The court distinguished Jones by noting that graduation prayer occurred at a "once-in-a-lifetime event that could be appropriately marked with a prayer," that the students in Jones were mature seniors, and "that the challenged prayer was to be non-sectarian and non-proselytizing." Id. at 406-07.

We are not persuaded by these distinctions. Lee clearly established that the "once-in-a-lifetime event" does not justify allowing a public school to authorize collective prayer under the circumstances of that case. To the contrary, the significance of that "once-in-a-lifetime" event weighed heavily in favor of invalidating the prayer. It was precisely because graduation was a "once-in-a-lifetime" event that students were denied the option of foregoing the ceremony to avoid compromising their religious scruples. See Lee, 505 U.S. at 595-96. Similarly, the Court in Lee was not convinced that the maturity level of high school students immunized them from the coercion endemic in coerced participation. Id. at 593 ("[F]or the dissenter of high school age, who has a reasonable perception that she is being forced by the State to pray in a manner her conscience will not allow, the injury is no less real."). Indeed, few would doubt the influence of peer pressure upon children in high school. Furthermore, we are not inclined to alter our analysis merely because Version D does not expressly allow proselytization. See County of Allegheny v. ACLU, Greater Pittsburgh Chp., 492 U.S. 573, 606-09.

Instead, we find the reasoning of the Court of Appeals for the Ninth Circuit in Harris v. Joint Sch. Dist. No. 241, 41 F.3d 447 (9th Cir. 1994) to be more persuasive. There, plaintiffs challenged a school district's policy of allowing graduating seniors to vote on whether prayer should be included in their graduation ceremony. The court concluded that the challenged practice violated the Establishment Clause even though any graduation prayer would have to be initiated, selected, and delivered by students.

> We cannot allow the school district's delegate to make decisions that the school district cannot make. When the senior class is given plenary power over a state-sponsored, state-controlled event such as high school graduation, it is just as constrained by the Constitution as the state would be.

Id. at 455.

The court noted that faculty members and administrators still supervised and controlled the graduation ceremony, and the school district assumed the cost of the event. Thus, the state's involvement offended the Establishment Clause. Id. at 454-55. "[T]hat school officials cannot divest themselves of constitutional responsibility by allowing the students to make crucial decisions should not be surprising. . . . Elected

officials cannot avoid constitutional mandates by putting them to a majority vote."  Id. at 455.  Indeed, if the vitality of our fundamental liberties turned upon their ability to inspire the support of a majority, the longevity of our "inalienable rights" would be controlled by the ebb and flow of political and social passion.

### C. Lemon v. Kurtzman

In Lemon v. Kurtzman, 403 U.S. 602 (1971), the Supreme Court announced a three part test to determine if a government practice offends the Establishment Clause.  Under Lemon, a government practice regarding religion will not offend the Establishment Clause if: (1) it has a secular purpose; (2) its principal or primary effect neither advances nor inhibits religion; and (3) it does not create an excessive entanglement of the government with religion.  Id. at 612-13.  "The" Lemon test has been referred to as one test, although the case itself suggests that it is a compilation of several approaches that have been used in conducting an inquiry under the Establishment Clause.  Justice O'Connor has observed that "setting forth a unitary test for a broad set of cases may sometimes do more harm than good. . . . Lemon has, with some justification, been criticized on this score."  Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet, 114 S. Ct. 2481, 2499 (1994) (O'Connor, J., concurring); id. at 2500 (O'Connor, J., concurring) ("[I]t seems to me that the case law will better be able to evolve . . . if it is freed from the Lemon test's rigid influence.").  Nevertheless, the framework of Lemon remains.  Wallace, 472 U.S. at 63 (Powell, J., concurring) ("Lemon v. Kurtzman identifies standards that have proved useful in analyzing case after case both in our decisions and in those of other courts.  It is the only coherent test a majority of the Court has ever adopted.") (citation omitted); seealso Committee for Public Educ. and Religious Liberty v. Nyquist, 413 U.S. 756, 772 (1973) (applying the "now well-defined three-part test" of Lemon) and Kiryas Joel, 114 S. Ct. at 2495 (Blackmun, J., concurring) ("I remain convinced of the general validity of the basic principles stated in Lemon, which have guided this Court's Establishment Clause decisions in over 30 cases.").

The Lemon test has been the subject of critical debate in recent years, and its continuing vitality has been called into question by members of the Supreme Court and by its noticeable absence from the analysis in some of the Court's recent decisions (including Lee).  Nevertheless, Lemon remains the law of the land, and we are obligated to consider it until instructed otherwise by a majority of the Supreme Court.  See Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd., 460 U.S. 533, 535 (1983) ("only [the Supreme] Court may overrule one of its precedents" and until such occurs, precedent "is still good law").

### (1) A Secular Purpose

The Board argues that Version D has the secular purpose of recognizing the students' rights to free speech and their desire to solemnize the occasion.  As we noted earlier, the Board's proclamation of the purpose of promoting free speech must be viewed in context with the policy's emphasis on providing an

option that would allow prayer to be delivered at graduation after Lee.

"Law reaches past formalism." Lee, 505 U.S. at 595. We have already explained why the Board's assertion of the secular purpose of free speech does not control. See supra part IV.A. "`Graduation ceremonies have never served as forums for public debate or discussions, or as a forum through which to allow varying groups to voice their views.'" Brody v. Spang, 957 F.2d 1108, 1118 (3d Cir. 1992) (citation omitted). Version D is no different in this respect. Principal Palatucci's testimony as to his readiness to arrest any student who might attempt to speak at graduation without prior approval of the administration (even if the graduates have approved) demonstrates the degree to which Version D is intended to further the secular purpose of free speech.

Prayer is, of course, religious speech, see Engel v. Vitale, 370 U.S. 421, 424-25 (1962). However, the constitutional guarantee of free speech does not secularize Version D's attempt to preserve "the long standing practice of conducting invocation and benediction prayer at graduation ceremonies." The Superintendent of Schools testified that when students were previously allowed to speak at graduation, their speeches had to be reviewed and approved by a faculty adviser or other school official; students were not allowed to speak on whatever topic they chose and the content of student speeches -- even when authorized -- was monitored. App. at 132-33. Yet, Version D prohibits school officials from reviewing the content of any student-led prayer that may be given. This "hands-off" approach only applies to religious speech, and is in stark contrast to the possibility of arrest that confronts a student who gives a secular presentation without prior authorization. The dualism is, however, consistent with the Board's desire to avoid one of the obstacles that invalidated the prayer in Lee (the administration's control over the content of the prayer).

In addition, Version D permits a student to give a sectarian, proselytizing address. If a student were to decide to give such an address after a student referendum "authorized" verbal prayer, the administration could not halt it without violating its own policy. If this were to occur, a proselytizing prayer (perhaps even degrading other religions) would be delivered in a forum controlled by the School Board. "A system which secures the right to proselytize religious . . . causes must also guarantee the concomitant right to decline to foster such concepts." Wallace, 472 U.S. at 51. Version D fails to achieve this balance.

The Board also argues that the inclusion of prayer solemnizes the graduation, but we are unable to understand why graduation would be any less solemn if students were not permitted to vote for prayer, a moment of silence or no observance at graduation. Surely students who graduate in a year where students may chose to have no prayer at all would think their graduation to be a solemn event, and it is doubtful that the Board would disagree with that assessment. The Supreme Court has approved religious invocations to solemnize the opening of

legislative sessions, see Marsh, 463 U.S. at 795 (1983) (a context easily distinguishable from a public high school graduation as noted supra).  The Court has also upheld religious references such as the "governmental declaration of Thanksgiving as a public holiday; printing `In God We Trust' on coins; and opening court sessions with `God save the United States and this honorable court.'"  Lynch, 465 U.S. at 693 (O'Connor, J., concurring).  However, we do not think the policy before us can be saved merely by the Board proclaiming that the policy serves a solemnizing purpose.  See Stone v. Graham, 449 U.S. 39, 41 (1980) (posting the Ten Commandments on the walls of public school classrooms violated the purpose prong of Lemon despite the state's avowed secular purposes of teaching the values conveyed by the Ten Commandments and demonstrating their connection to the legal system); see also Schempp, 374 U.S. at 223-24.

Furthermore, assuming arguendo that Version D serves the secular purpose of solemnizing one's graduation, we believe it does so in a constitutionally impermissible manner.  Students who are devoutly religious may feel that prayer is not something that should be put to a vote.  Such students may even have a religious objection to such a vote and may, therefore, refuse to vote out of religious conviction.  Version D puts such students on the horns of an impossible dilemma by forcing them to chose between doing violence to their own religious beliefs and voting, or abstaining and thereby risking that their forbearance may provide the margin of victory for those with a different religious preference.  Regardless of how the referendum comes out, this state policy has forced such a student into an impossible, and impermissible, choice.  Accord Engel, 370 U.S. at 431-32 ("The Establishment Clause thus stands as an expression of principle on the part of the Founders of our Constitution that religion is too personal, too sacred, too holy, to permit its `unhallowed perversion' by [the State].").  Still other students may face a similar predicament because they are atheists and refuse to vote out of conscience -- as is their right.  Such a Hobson's choice "sends a message to nonadherents that they are outsiders, not full members of the political community . . . ."  Lynch, 465 U.S. at 688 (O'Connor, J., concurring).  The Constitution forbids that message, just as it forbids the procedure authorized by this policy.

### (2) The Endorsement of Religion

Under the second prong of Lemon, a government practice can neither advance, nor inhibit religion.  This means that a challenged practice must "not have the effect of communicating a message of government endorsement or disapproval of religion."  Lemon, 403 U.S. at 692.  This endorsement test has at times been characterized as part and parcel of the Lemon test, and at other times as separate and apart from it.  Whether "the endorsement test" is part of the inquiry under Lemon or a separate inquiry apart from it, the import of the test is the same.  We must determine whether, under the totality of the circumstances, the challenged practice conveys a message favoring or disfavoring religion.  "The question under endorsement analysis, in short, is whether a reasonable observer would view

such longstanding practices as a disapproval of his or her particular religious choices . . . ." Allegheny, 492 U.S. at 631 (O'Connor, J., concurring). Thus, the viewpoint of the reasonable observer (adherent or nonadherent) helps us to determine if the "principal or primary effect [is] one that neither advances nor inhibits religion." Lemon, 404 U.S. at 612; see also School Dist. of Grand Rapids v. Ball, 473 U.S. 373, 390 (1985). In any such inquiry, "the `history and ubiquity' of a practice is relevant because it provides part of the context in which a reasonable observer evaluates whether a challenged governmental practice conveys a message of endorsement of religion." Id. at 630.

The importance of the context of a challenged practice is illustrated by comparing the holding of the Court in Lynch with the holding in Allegheny. In Lynch, the Court held that a city did not offend the Establishment Clause by including a creche depicting the Nativity scene, along with other figures and decorations traditionally associated with Christmas, in its Christmas display in a private park in the downtown shopping district. 465 U.S. at 687. In addition to figures associated with the Nativity scene, the creche contained "a Santa Claus house, reindeer . . ., candy-striped poles, a Christmas tree," and numerous other figures including a clown, elephant and teddy bear. Id. at 671. Notwithstanding the religious significance of the creche, the Court reasoned that "[w]hen viewed in the proper context of the Christmas Holiday season, it is apparent that . . . the inclusion of the creche is [not] a purposeful or surreptitious effort to express some kind of subtle governmental advocacy of a particular religious message." Id. at 680. The Court felt that the creche "depict[ed] the historical origins of this traditional event long recognized as a National Holiday." Id.

In Allegheny, the Court again addressed the constitutionality of a creche displayed as part of a city's holiday celebration. There, unlike in Lynch, the creche was located on the Grand Staircase of the county courthouse. 492 U.S. at 578. The display was also surrounded by a fence and poinsettia floral frame and included small evergreen trees, but unlike the display in Lynch, did not include figures of Santa Claus, reindeer, or other decorations traditionally associated with the secular aspects of Christmas. Id. at 580-81. The Court noted that the location of the creche on the Grand Staircase of the Allegheny County Courthouse -- "the `main' and `most beautiful part' of the building that is the seat of county government," id. at 599 -- would make it almost impossible for any reasonable viewer to "think that it occupie[d] this location without the support and approval of the government." Id. at 599-600. Accordingly, the Court ruled that the display was an impermissible endorsement of religion under Lemon.

> Lynch teaches that government may celebrate Christmas in some manner and form, but not in a way that endorses Christian doctrine. Here, Allegheny County has transgressed this line. It has chosen to celebrate Christmas

in a way that has the effect of endorsing a patently Christian message: Glory to God for the birth of Jesus Christ.  Under Lynch, and the rest of our cases, nothing more is required to demonstrate a violation of the Establishment Clause.

Id. at 601–02.

However, the Court upheld the city's display of a Chanukah menorah placed next to a Christmas tree and a sign saluting liberty, all of which were located just outside the City–County Building.  Id. at 620–21.  In doing so, the Court reasoned:

[T]he relevant question for Establishment Clause purposes is whether the combined display of the tree, the sign, and the menorah has the effect of endorsing both Christian and Jewish faiths, or rather simply recognizes that both Christmas and Chanukah are part of the same winter–holiday season, which has attained a secular status in our society.  Of the two interpretations of this particular display, the latter seems far more plausible . . . .

Id. at 616.  Accordingly, the reasonable observer would not necessarily interpret the display as an endorsement of Christianity and Judaism.

We can not say the same of Version D.  Viewing it in context with the "longstanding tradition" it attempts to perpetuate after Lee would certainly leave the reasonable nonadherent with the impression that his or her religious choices were disfavored.  This is particularly true where, as here, prayer would have been conducted at graduation based upon a plurality even though a majority of seniors voted not to have prayer.

Although it is true that Version D does not require the view that prevails in any given year to prevail in subsequent years, it is nonetheless true that the effect of the particular prayer that is offered in any given year will be to advance religion and coerce dissenting students.  See Jaffree v. Wallace, 705 F.2d 1526, 1534–35 (11th Cir.) ("The primary effect of prayer is the advancement of one's religious beliefs."), reh'g denied, 713 F.2d 614 (11th Cir. 1983), aff'd, 466 U.S. 924 (1984).  The Constitution's "prohibition against governmental endorsement of religion `preclude[s] government from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred.'"  Allegheny, 492 U.S. at 593 (quoting Wallace v. Jaffree, 472 U.S. at 70); see also Texas Monthly, Inc. v. Bullock 489 U.S. 1, 27, 28 (1989) (Blackmun, J., concurring in the judgment) ("government may not favor religious belief over disbelief" or adopt a "preference for the dissemination of religious ideas").

The disclaimer that is required by Version D does weigh in favor of the Board's position under a Lemon analysis.  However, it does not weigh so heavily as to neutralize the counterweight of the advantage the policy gives religious speech over secular speech.  Despite the printed disclaimer, the reasonable observer

here could not help but conclude that the Board favors the inclusion of prayer.

"[N]ot every law that confers an `indirect,' `remote,' or `incidental' benefit upon [religion] is, for that reason alone, constitutionally invalid."  Nyquist, 413 U.S. at 771 (citation omitted).  However, Version D provides a benefit that is neither "indirect," "remote," nor "incidental."  The Supreme Court has never countenanced a practice that requires some members of a community to subordinate their religious preferences to those of a majority.  Rather, "[t]he Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from `making adherence to a religion relevant in any way to a person's standing in the political community.'"  Allegheny, 492 U.S. at 593-94 (quoting Lynch, 465 U.S. at 687 (O'Connor, J., concurring)).

Although the Supreme Court has allowed certain accommodations to religion, see Corporation of Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327, 336-37 (1987) (upholding law exempting religious employers from Title VII); Zorach, 343 U.S. at 314-15 (upholding statutory "released time" program whereby public schools release students during the school day to receive off-site religious education), "accommodation is not a principle without limits."  Kiryas Joel, 114 S. Ct. at 2492.  The Supreme Court "[has] never hinted that an otherwise unconstitutional delegation of political power to a religious group could be saved as a religious accommodation."  Id. at 2493.  As Justice Souter explained in Lee:

> Religious students cannot complain that omitting prayers from their graduation ceremony would, in any realistic sense, 'burden' their spiritual callings.  To be sure, many of them invest this rite of passage with spiritual significance, but they may express their religious feelings about it before and after the ceremony.  They may even organize a privately sponsored baccalaureate if they desire the company of like-minded students.  Because they accordingly have no need for the machinery of the State to affirm their beliefs, the government's sponsorship of prayer at the graduation ceremony is most reasonably understood as an official endorsement of religion . . . .

505 U.S. at 629-30 (Souter, J., concurring).

Whatever accommodation may require, it is clear that government neutrality toward religion still is the hallmark of the Religion Clauses.  See Kiryas Joel, 114 S. Ct. at 2487 ("A proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of `neutrality' toward religion, favoring neither one religion over others nor religious adherents collectively over nonadherents.") (internal quotations and citation omitted).  Version D can not be justified as an accommodation because it seeks to accommodate the preference of some at the expense of others and thereby crosses

the required line of neutrality. "The First Amendment . . . gives no one the right to insist that in pursuit of their own interests others must conform their conduct to his own religious necessities." Estate of Thornton v. Caldor, Inc., 472 U.S. 703, 710 (1985) (internal quotations and citation omitted).

### (3) Excessive Entanglement With Religion

The third prong of the Lemon test -- no excessive entanglement of government with religion -- is a much closer question. As noted earlier, the state's involvement here is far less than the entanglement that was present in Lemon. However, because we find that Version D of Policy IKFD violates the first two prongs Lemon, we need not determine if it also violates the third prong.

### V. CONCLUSION

In closing, we emphasize the difficulty posed by the issue that we confront here and the intensity and sincerity of persons on both sides. Issues of religion touch litigants and interested observers of the law as few other issues can. For example, one of the students who opposed Version D testified before the district court that he received threatening letters in his school locker and threatening telephone calls at home after coming forward in this case. App. at 93.

References to, and images of, religion are to be found throughout this society. See Zorach, 343 U.S. at 313-14. Yet, the prevalence of religious beliefs and imagery cannot erode the state's obligation to protect the entire spectrum of religious preferences from the most pious worshipper to the most committed atheist. Those preferences are the business of the individual, not the state nor the public schools it maintains. The First Amendment does not allow the state to erect a policy that only respects religious views that are popular because the largest majority can not be licensed to impose its religious preferences upon the smallest minority.

We need not now address the parameters of these prohibitions beyond the precise questions raised by the specific policy before us. The district court's order enjoined the School Board "from conducting a school-sponsored graduation ceremony that includes a prayer, whether it be an invocation, a benediction or a prayer in any other form." App. at 210. In context, we understand the district court's order to foreclose a school-sponsored graduation service involving an invocation, benediction or prayer pursuant to Policy IKFD Version D. As so read, we affirm the judgment of the district court.

ACLU v. Black Horse Pike Regional Board of Education, etc., No. 94-5233

MANSMANN, Circuit Judge, dissenting, joined by Judges Nygaard, Alito and Roth.

I must dissent because I believe the issue squarely before us, whether student-initiated, -directed and -composed prayer at high school graduation violates the First Amendment, requires that we examine the application of both the Establishment Clause and the free exercise/free speech right, balancing the graduates' free exercise and speech rights against any compelling state interest which might otherwise justify impinging these guarantees.

In placing these interests on the balance scale, I am concerned, however, that an approach which exaggerates and emphasizes the Court's Establishment Clause tests would be fragmented and would tend to imply that the First Amendment religion clauses embody contradictory and irreconcilable principles. The Court's free exercise jurisprudence clearly suggests that a separation policy which overextends into the domain of free exercise and free speech must be suspect. The Establishment Clause should not be read to prohibit activity which the Free Exercise Clause protects. Board of Educ. v. Mergens, 496 U.S. 226, 250 (1990) ("there is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect"). Thus, I would analyze the present case in light of the fact that while the state may not establish a religion, it must not also disadvantage or discriminate against studentreligious activity, nor imply that religion, or religious acts, are disfavored.

In light of the Establishment Clause's broad purpose to serve the free exercise of religion, I would hold that here the narrowly fact-bound holding of Lee v. Weisman, 112 S. Ct. 2649 (1992), does not preclude such student directed, composed and delivered prayer as an integral segment of the graduation ceremony, where there is not, by policy, virtually any school administration or faculty involvement. In addition, applying the Court's three-part Establishment Clause analysis articulated in Lemon v. Kurtzman, 403 U.S. 602 (1971), I would hold that the defendants' challenged activity also meets the Lemon test as to compliance with the Establishment Clause. Finally, I would conclude that the state has not articulated any compelling interest to countermand the graduates' rights of free exercise and free expression. Thus, I would reverse the permanent injunction issued against the defendants.

I.

In Lee v. Weisman, the Court held that Lee, a middle school principal who decided to include prayer in the graduation ceremony for Deborah Weisman, chose a rabbi to offer the prayer, gave the rabbi guidelines on the content of the prayer, and advised the rabbi that the invocation should be non-sectarian, made choices attributable to the state. Moreover, the Court held that Lee's advice concerning the content of the rabbi's prayer constituted direct state control. These findings, combined with the Court's finding that the school's supervision and control of

high school graduation subtly coerced graduates to stand in respectful silence during the invocation, rendered the state action unconstitutional, despite the fact that participation in the prayer or in the graduation ceremony itself was voluntary. 112 S. Ct. at 2655-56.  Emphasizing that the particular facts in the case were outcome-determinative, the Court stated:

> These dominant facts mark and control the confines of our decision:  State officials direct the performance of a formal religious exercise at promotional and graduation ceremonies for secondary schools.  Even for those students who object to the religious exercise, their attendance and participation in the state-sponsored religious activity are in a fair and real sense obligatory, though the school district does not require attendance as a condition for receipt of the diploma.

112 S. Ct. at 2655.

Adverting to the "heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools," id. at 2658, the Court asserted that the effort on the part of the school official to "monitor prayer will be perceived by the students as inducing a participation they might otherwise reject."  Id. at 2657.  The Court declined to apply the factors it earlier set forth in Lemon v. Kurtzman, or to explicitly reconsider the status of that decision.

Because of the highly fact-sensitive nature of the Lee decision, I cannot induce from the Court's reasoning any broad constitutional principle which bans prayer at all high school graduation ceremonies, regardless of the manner in which the decision to include prayer is made or implemented.  Indeed, Lee bids us to scrutinize and to distinguish the facts of each case.

In Lee the Court found the following, working in tandem, to constitute state sponsorship:

1)  The high school principal, a state actor, made a unilateral decision to include an invocation and benediction in the graduation ceremony;

2)  The high school principal, a state actor, made a unilateral decision with regard to the selection of a clergyman to offer the invocation and benediction; and

3)  The high school principal, a state actor, actively influenced and monitored the content of the invocation and benediction to be given.

The case before us contains neither the indicia of state action nor the particular facts which were outcome- determinative in Lee.  Here the graduates are entirely entrusted with the decision to include or not to include a graduation invocation. The graduates maintain control throughout the decisional process and without the active or surreptitious influence or monitoring by school officials.  Policy IKFD precludes the invitation of a clergyman to deliver any invocation.  No school official may influence or monitor the content of the prayer.  The polling instrument itself is neutral.  The government practice in

question here is not a decision to include prayer at graduation; nor is it the practice of monitoring or influencing the content of a graduation prayer. The government practice at issue here is the highly democratic one of allowing the graduating class to vote on the issue of graduation prayer while maintaining an official stance of strict neutrality throughout the entire process. Hence, none of the decisions made by the graduating class concerning graduation prayer can be attributed to the state and the Establishment Clause is therefore not even implicated. I do not find anything in Lee which would compel a holding that policy IKFD is unconstitutional.

The majority expresses concern over the degree of control exercised by the school: 1) when it rejected a student's request for a "safe sex" speaker at graduation, and 2) when the principal stated that he would not permit an unscheduled speaker. Certainly the school, without violating the neutrality principles of Lemon, could restrict all speeches as to time and indeed as to appropriateness -- here, to "solemnizing" speech; Policy IKFD's subject matter and speaker restrictions do not constitute viewpoint expression or suppression.

I would follow the lead of our sister court of appeals in Jones v. Clear Creek Indep. Sch. Dist., 977 F.2d 963 (5th Cir. 1992), a graduation prayer case factually similar to the case before us. In Jones, the Supreme Court vacated the Fifth Circuit's judgment and remanded the case for further consideration in light of the Court's decision in Lee v. Weisman, which the Court decided subsequent to the Fifth Circuit's first determination. Upon reconsideration, the Fifth Circuit held that Lee did not invalidate Clear Creek's graduation and invocation policy, which did not mandate prayer or any invocation, but merely permitted graduation prayer to be delivered by a graduate if the graduating class so chose. Moreover, in Jones the resolution in question permitted a school official to offer "advice and counsel" to the graduating class in the decision whether to include an invocation at graduation. This single fact, which is absent in the case before us, placed the Jonescase even closer to the constitutional boundary established in Lee than the case before us. Nevertheless, the Fifth Circuit held that Clear Creek exercised significantly less control over the invocation content than did the school principal in Lee v. Weisman, noting that Clear Creek did not solicit invocations, but merely refused to accept sectarian or proselytizing invocations. 977 F.2d at 971. The court noted that the resolution merely tolerated nonsectarian, non-proselytizing prayer, but neither required nor favored it. Id.

By contrast, Black Horse's policy for prayer at graduation ceremonies is more liberal in that it extends the scope of its toleration to include even sectarian prayer, if the graduates so choose. I believe that in this way Policy IKFD comports with the First Amendment's prohibition against the inhibition of the practice of religion or of free expression, while at the same time precludes even the remote possibility of an establishment of religion by virtue of its uncompromising neutrality.

I would also find the element of psychological coercion,

which the Lee Court presumed and the majority stresses, to be absent where the graduating seniors have participated in the decision regarding prayer at graduation.  There could not be any confusion on the part of the reasonable graduating senior, who has been made aware of the senior class poll and has been invited to participate, with regard to whether the result of that poll represents an official opinion of the state or the will of the senior class.  Furthermore, although Lee failed to emphasize the distinction between high school graduates and the rest of the younger, less mature high school student body, prior Supreme Court caselaw has acknowledged that post-secondary school students are less easily coerced than younger students.  See, e.g., Board of Educ. of Westside Community Schools v. Mergens, 496 U.S. 226, 235-37, 250 (1990) ("university students are . . . less impressionable than younger students") (citing Widmar v. Vincent, 454 U.S. 263, 274, n.14 (1981)).  The graduation ceremony itself is a public ritual symbolic of the graduates' passage into responsible young adulthood, and is synchronized, more or less, with other official acknowledgements of adult initiation, such as conference of the right to vote and the responsibility of males to register for the draft.

In addition to the relative level of maturity of the senior class, the very nature of graduation, which elevates the studentto the status of graduate, must be considered.  Although the student/graduate distinction did not countermand the other various facts which the Court in Lee weighed against graduation prayer, I believe that the graduation ceremony setting is significantly different in nature from the classroom setting, and in the absence of other offending factors, warrants a less restrictive approach to religion.  Certainly the contested activity does not involve the curriculum of the school; nor does the graduation ceremony implicate the teacher-student relationship concerning the transmission of knowledge from the former to the latter.  Thus, the concerns which the Court has expressed in those cases where some form of religion has been injected into the school curriculum are not directly operative here.  See, e.g., Edwards v. Aguillard, 482 U.S. 578 (1987) (teaching of scientific evidence supporting creation theory); Wallace v. Jaffree, 472 U.S. 38 (1985) (moment of silence at beginning of each school day); Stone v. Graham, 449 U.S. 39 (1980) (posting of Ten Commandments on classroom walls); Abington School Dist. v. Schempp, 374 U.S. 203 (1963) (Bible reading over PA system before classes); Engel v. Vitale, 370 U.S. 421 (1962) (mandated recitation of official state prayer each day in public schools); Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203 (1948) (weekly religious instruction in public school buildings during school hours by members of clergy).

I do not share the majority's confidence in the Ninth Circuit's holding in Harris v. Joint Sch. Dist. No. 241, 41 F.3d 447 (9th Cir. 1994), cert. granted, vacated and remanded, ___ U.S. ___, 115 S. Ct. 2604, 132 L.ED.2d 849 (1995).  Following the precedent set by an earlier Ninth Circuit case, Collins v. Chandler Unified Sch. Dist., 644 F.2d 759 (9th Cir.), cert. denied, 454 U.S. 863 (1981), the court in Harris held that "the

school ultimately controls [the graduation] event" and hence cannot avoid state involvement so as to implicate the Establishment Clause as interpreted under Lee. 41 F.3d at 454. The court further held that the seniors' decision regarding prayer was per se tainted with official sanction because the seniors derived their decisional authority from the delegation of official school authority and because "the school under[wrote] the [graduation] event" by providing the use of the school building. Id. In my view, this holding would preclude virtually all prayer at a public high school graduation ceremony, a holding which unnecessarily and without warrant extends the holding of Lee. I am also concerned that the Ninth Circuit failed to distinguish the classroom setting from the graduation setting, and the student from the graduate. 41 F.3d at 458. I find no precedent supporting the Ninth Circuit's position that public high school seniors "enter[] the domain of the Establishment Clause," id., and are precluded from independently choosing to communally express their gratitude to God, invoke the divine presence or seek God's blessing, as part of their graduation ceremony. Since all aspects of the graduation prayer decision are at the discretion of the graduating senior class, I would hold that Policy IKFD does not unconstitutionally establish a religion under Lee.

## II.

I agree with the majority that the Lemon test is still precedential, although from the start it has been the focus of critical debate, including the irony that its application encourages the federal courts to regulate in an area for which the First Amendment was designed to insure against any government interference. I part company in that I believe that Policy IKFD does not violate any one of the three elements of Lemon.

## A.

In order to pass the first prong of the Lemon test, Policy IKFD need not be shown to be exclusively secular. Lynch v. Donnelly, 465 U.S. 668, 681 n.6 (1984); Wallace v. Jaffree, 472 U.S. at 64 (Powell, J., concurring). Furthermore, accommodation of religion or religious practice in general helps to preserve the mediating institutions of the public morals, a secular civic good. Hence, accommodation itself serves a secular purpose. A valid secular purpose is not constitutionally compromised when there are incidental, even substantial, benefits to religion. Lynch, 465 U.S. at 680 (citing Everson v. Board of Education, 330 U.S. 1 (1947); Board of Education v. Allen, 392 U.S. 236 (1968); Walz v. Tax Commission, 397 U.S. 664 (1970); Tilton v. Richardson, 403 U.S. 672 (1971)).

To determine a secular purpose, the Court generally has exercised deference with regard to stated legislative or policy purpose, and will find a sham secular purpose only when there can be no question that the challenged conduct establishes, or tends to establish, a religion. Aguilar v. Felton, 473 U.S. 402, 416–17 (1985) (Powell, J., concurring); Lynch, 465 U.S. at 680 ("The Court has invalidated legislation or governmental action on the

ground that a secular purpose was lacking, but only when it has concluded there was no question that the statute or activity was motivated wholly by religious considerations.") (citing Stone v. Graham, 449 U.S. at 41; Epperson v. Arkansas, 393 U.S. 97, 107-09 (1968); Abington School Dist. v. Schempp, 374 U.S. at 223-24; Engel v. Vitale, 370 U.S. at 424-25); see also Edwards v. Aguillard, 482 U.S. at 586-87.

Policy IKFD expressly states, "[i]n the spirit of protected free speech, the pupils in attendance must choose to have prayer . . . ." (emphasis added). In addition to this express secular purpose of promoting the free speech of the graduating seniors, the school asserts that Policy IKFD serves the valid secular purpose of permitting the graduates to solemnize the occasion of their graduation through ceremonial prayer. The concern should not be, as the majority expresses it, that graduation would not be less solemn without the vote. The importance of ceremonial prayer is that the Court has acknowledged that it indeed serves the valid secular purpose of solemnization. See, e.g., Lynch, 465 U.S. at 693 (O'Connor, J., concurring); County of Allegheny v. Greater Pittsburgh ACLU, 492 U.S. 573, 595-96 n.46 (1989); Engel v. Vitale, 370 U.S. at 435 n.21 (1962); see also Jones v. Clear Creek Indep. Sch. Dist., 977 F.2d at 966-67.

As the district court noted in the present case, Policy IKFD serves yet a third secular purpose which is educational, albeit not curriculum-related, in that the process of independently coordinating and resolving the issue of graduation prayer permits the prospective graduates to gain firsthand insight into the effects of current constitutional jurisprudence on their public behavior, and is itself an exercise in responsible citizenship.

Moreover, the challenged activity here cannot be deemed to cause those graduates who are opponents of prayer at graduation, for the many different reasons cited by the majority, to feel that they are not fully incorporated into the community. To the contrary, every graduate under Policy IKFD is fully invited to partake in the community via the right to vote on the issue of school prayer, and each individual graduate, regardless of his or her position on the issue, has an equal opportunity to influence the graduation ceremony. Here the challenged activity is a democratic exercise. There is no guarantee that the view that prevails in any given year will prevail in the following year. The reasonably tolerant graduate, knowing of his or her opportunity to partake in the class poll, cannot reasonably be thought to conclude that the state is establishing religion if prayer prevails in the poll in any given year. The non-endorsing language of Policy IKFD, the explicit mandatory disclaimer, and the neutrality of the polling instrument itself, would lead me to hold that the effect of Policy IKFD is not principally or primarily to advance religion. On the other hand, an absolute prohibition on ceremonial prayer at graduation would, in my view, violate the Free Exercise Clause by unduly inhibiting the practice of religion, and would also implicate the free speech guarantees of the First Amendment.

Given the school's highly credible express secular motivations and neutrality of purpose as regards religion, both

written into Policy IKFD and argued before us, I would find that Policy IKFD easily passes the secular purpose test.  The ACLU's assertions that Policy IKFD cannot satisfy this prong of Lemonbecause prayer is per se religious and that ceremonial prayer may not be utilized for purposes of solemnization or freedom of expression where wholly secular means are available, go far beyond the requirements of the first prong of Lemon, which does not require that a secular purpose be achieved via exclusively secular means.  Furthermore, the means employed by the school towards its secular end pursuant to Policy IKFD is not itself intrinsically religious.  Student polling is a wholly secular activity, and the result of the poll in question is the expression of the graduating class, not the school district.

### B.

With respect to the second prong of the Lemon test, I agree that the test asks whether the challenged activity "in fact conveys a message of endorsement or disapproval."  Lynch, 465 U.S. at 690.  While it is solidly established that the government is precluded from favoring one particular religious denomination over another, or from establishing an official state religion, I note that the members of the Court divide as to whether the Establishment Clause precludes the government from conveying a message that it endorses or encourages religion in a generic sense, or especially acknowledges or accommodates the broad Judeo-Christian heritage of our civil and social order.  This division persists despite the Court's attempt to interpret comprehensively the Establishment Clause in Everson v. Board of Education, 330 U.S. 1, 15-16 (1947), holding that the First Amendment prohibits the federal and state governments from offering non-preferential aid to all religions and from levying any tax to support any religious activity or institution.  See, e.g., Wallace, 472 U.S. at 70 (O'Connor, J., concurring) ("[The endorsement test] does preclude government from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred"); but cf. Wallace, 472 U.S. at 98 (Rehnquist, J., dissenting) ("[Madison] did not see [the First Amendment] as requiring neutrality on the part of government between religion and irreligion."); Zorach v. Clauson, 343 U.S. 306, 313 (1952) ("We are a religious people whose institutions presuppose a Supreme Being."); Marsh v. Chambers, 463 U.S. 783, 792 (1983) ("To invoke Divine guidance on a public body . . . is not . . . an `establishment' . . . or a step toward establishment; it is simply a tolerable acknowledgement of beliefs widely held among the people of this Country."); Lynch, 465 U.S. at 673 (The Constitution "affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any . . . . `[C]allous indifference' . . . was never intended by the Establishment Clause . . . . [and] would bring us into `war with our national tradition as embodied in the First Amendment's guaranty of the free exercise of religion.'" (citations omitted)).  In Mergens, the Supreme Court unequivocally held that:

The Establishment Clause does not license government to

> treat religion and those who teach or practice it,
> simply by virtue of their status as such, as subversive
> of American ideals and therefore subject to unique
> disabilities.

Mergens, 496 U.S. at 248.  See also Rosenberger v. Rector & Visitors of University of Va., 115 S. Ct. 2510, 2522 (1995) (where government program is neutral toward religion (as Policy IKFD is), restrictions on religious speech are not justified by the Establishment Clause); such viewpoint discrimination risks fostering hostility to religion, undermining the very neutrality of the Establishment Clause requires, id. at 2525.

The First Amendment does not condemn legislation or official policy that has the effect of assisting religion generally; the First Amendment itself gives religion an exceptionally protected status.  It does not necessitate an interpretation inhospitable to religion where religion may not be acknowledged in any public arena.  Such an interpretation runs counter to the notion of neutrality and denigrates religion in violation of the Free Exercise Clause.  See Lynch v. Donnelly, 465 U.S. 668, 673 (1983) (the Constitution does not "require the complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility towards any . . . .  Indeed . . . such hostility would bring us into `war with our national tradition as embodied in the First Amendment's guaranty of the free exercise of religion.'").  Neutrality may be achieved through a policy, such as Policy IKFD, that is as hospitable to religion as it is to irreligion.

The majority's "reasonable nonadherent" could not be confused into thinking that "his or her religious choices were disfavored."  Opinion at 33.  Policy IKFD mandates an explicit and unequivocal disclaimer, one that covers not only the official position of the school but also the views of any of the particular graduates, on the graduation program in the event the student body votes for the inclusion of prayer at the graduation ceremony.  Moreover, the outright ban on graduation prayer that the majority espouses would make a reasonable religionist believe that his or her exercise of religion was disfavored by the state, especially against the pervasive backdrop of a century and a half of prayer at such gatherings.

C.

Because I find that the first two Lemon prongs are not violated, I (unlike the majority) must move to the third prong, whether Policy IKFD fosters excessive institutional entanglement between the church and the state.  Lemon discusses two ways in which entanglement can be excessive.  Entanglement may be implicated when a state policy or legislative act draws the state into an intimate and continual monitoring or overseeing of religious matters.  403 U.S. at 614-22.  Entanglement may also be implicated where a state policy or legislative act creates an abnormal potential for political divisiveness.  403 U.S. at 622.  The Court has indicated, however, that political divisiveness alone will not create an entanglement.  Lynch, 465 U.S. at 684

(". . . this Court has not held that political divisiveness alone can serve to invalidate otherwise permissible conduct").  The Court has also recognized that "[e]ntanglement is a question of kind and degree."  Lynch, 465 U.S. at 684.

I find nothing in Policy IKFD which resembles the enduring entanglement identified in Lemon.  By design Policy IKFD creates a virtual total absence of administrative entanglement of any sort.  With regard to political divisiveness, Policy IKFD involves absolutely no sponsorship or subsidy to any religious institution or related organization.  There is nothing in the record which would suggest that Policy IKFD engenders or will engender so high a degree of political divisiveness as to pose "a threat to the normal political process."  Lemon, 403 U.S. at 622 (citations omitted).  On the other hand, I would not attribute the political divisiveness, to whatever extent it may or may not exist, which this lawsuit itself engenders, to Policy IKFD.  SeeLynch, 465 U.S. at 684–85 ("A litigant cannot, by the very act of commencing a lawsuit, . . . create the appearance of divisiveness and then exploit it as evidence of entanglement.")  I do not find any evidence of excessive entanglement and am thus satisfied that Policy IKFD satisfies all three prongs of the Lemon test.

### III.

In closing, I must challenge the majority's view that "the prevalence of religious beliefs and imagery cannot erode the state's obligation to protect the entire spectrum of religious preferences from the most pious worshipper to the most committed atheist."  Opinion at 37.  The Free Exercise Clause guarantees against the interference of the state in expressive and associational religious activity.  The free speech clause is a related, but more generic, guarantee for a broad range of expressive and associational activity.  It is well-acknowledged that neither clause offers unlimited protection for such activities.  It is equally well-acknowledged that the state may not impinge the interests of free exercise and free speech without proffering a compelling state interest and demonstrating the necessity of its restrictive action.

Aside from the ACLU's assertion that Policy IKFD establishes or tends to establish a religion, it offers no compelling reason, constitutional or otherwise, for a permanent injunction against a senior class' free choice to express thanks through its own prayer at a graduation ceremony.  Thus, I believe the free exercise and free expression interests of the graduating class of Highland Regional High School must prevail.