

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-26-2000

# Planned Parenthood v. Farmer

Precedential or Non-Precedential:

Docket 99-5272

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Planned Parenthood v. Farmer" (2000). *2000 Decisions*. Paper 152.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/152

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 26, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 99-5042 and 99-5272

PLANNED PARENTHOOD OF CENTRAL NEW JERSEY;
HERBERT HOLMES, M.D.; DAVID WALLACE, M.D.;
GERSON WEISS, M.D.; on behalf of themselves
and their patients

v.

JOHN FARMER, JR.*, Attorney General of the State of
New Jersey, in his official capacity, and his successors in
office; NEW JERSEY BOARD OF MEDICAL EXAMINERS,
and their successors in office; CHRISTINE GRANT*,
Commissioner of the Department of Health and
Senior Services, in her official capacity, and
her successors in office

NEW JERSEY LEGISLATURE, by and through DONALD T.
DIFRANCESCO, in his official capacity as President of the
New Jersey Senate, and JACK COLLINS, in his official
capacity as Speaker of the New Jersey Assembly, and as
the representative of the New Jersey Assembly
(Intervenors in D.C.),
        Appellants

*Amended Pursuant to F.R.A.P. 43 (c)(2)

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

D.C. No.: 97-cv-06170
District Judge: The Honorable Anne E. Thompson

Argued: November 19, 1999

Before: ALITO, BARRY and GARTH, Circuit Judges .

(Opinion Filed: July 26, 2000)

Richard F. Collier, Jr., Esquire
 (Argued)
Collier, Jacob & Mills
580 Howard Avenue
Corporate Park III
Somerset, NJ 08873

 Attorney for Appellants

Talcott Camp, Esquire (Argued)
Cora K. Tung, Esquire
Louise Melling, Esquire
Reproductive Freedom Project
American Civil Liberties Union
 Foundation
125 Broad Street, 18th Floor
New York, NY 10004-2400

Lenora Lapidus, Esquire
American Civil Liberties Union
 of New Jersey Foundation
35 Halsey Street, Suite 4B
Newark, NJ 07102

Dara Klassel, Esquire
Roger Evans, Esquire
Planned Parenthood Federation
 of America
810 Seventh Avenue
New York, NY 10019

 Attorneys for Appellees

OPINION OF THE COURT

BARRY, Circuit Judge.

The majority opinion which follows was in final form before the Supreme Court of the United States heard argument in the appeal of Carhart v. Stenberg , 192 F.3d 1142 (8th Cir. 1999). The Supreme Court has now issued

2

its opinion in that case, finding Nebraska's "partial birth abortion" statute -- a statute nearly identical to the one before this Court -- unconstitutional. See Stenberg v. Carhart, ___ U.S. ___, 2000 WL 825889 (U.S. June 28, 2000). Because nothing in that opinion is at odds with this Court's opinion; because, in many respects, that opinion confirms and supports this Court's conclusions and, in other respects, goes both further than and not as far as, this opinion; and, because we see no reason for further delay, we issue this opinion without change.

Defendant-Intervenor, the New Jersey State Legislature (the "Legislature"), appeals the decision of the United States District Court for the District of New Jersey holding the New Jersey Partial-Birth Abortion Ban Act of 1997 (the "Act") unconstitutional and permanently enjoining enforcement of the Act. In a comprehensive opinion, the District Court found the Act unconstitutional because it: (1) is void for vagueness; and (2) places an undue burden on a woman's constitutional right to obtain an abortion. See Planned Parenthood of Cent. N.J. v. Verniero, 41 F. Supp. 2d 478, 504 (D.N.J. 1998). We will affirm.

I. BACKGROUND

On December 15, 1997, the New Jersey State Legislature, overriding the governor's veto, joined what is now a majority of states in enacting a law banning "partial-birth abortions."1 Since the first such statute was passed in Ohio, statutes similar to the Act have been wending their way through the judicial system with various courts attempting to ascertain the constitutionality of each statute within the context of over twenty-five years of abortion rights jurisprudence.

While the vast majority of courts have enjoined the enforcement of these statutes because they are unconstitutionally vague and impose an undue burden on
_____

1. See App. at 1846 (listing state statutes). The Congress of the United States also passed federal "partial birth abortion" bans in 1995 and 1997. Both were vetoed by the President.

women who seek to have an abortion, it is the statute before us on which we must focus our attention. As we do so, we are fully aware that this dispute is framed by deeply held convictions concerning abortion by men and women of good will, convictions which we recognize and respect. On the one side of the abortion issue, and the emotionally charged public debate that issue engenders, are those who believe that all abortion procedures are equally objectionable, not merely the "partial birth abortion" procedure at issue in this case, a position largely foreclosed, as a matter of law, by Roe and Casey. On the other side of the issue and the debate are those who fear any encroachment on a woman's right to seek an abortion. It is not for us to decide who is right and who is wrong as a matter of conviction or philosophy. Rather, after carefully analyzing the statute before us, we must decide whether that statute passes constitutional muster.

A. Procedural History

The day the Act was to become effective, Planned Parenthood of Central New Jersey ("Planned Parenthood") and several physicians (collectively as "plaintiffs"), filed suit on their own behalf and on behalf of their patients against the Attorney General of the State of New Jersey, the New Jersey Board of Medical Examiners, and the Commissioner of the Department of Health and Senior Services of New Jersey ("HSS") (collectively as "defendants"). Plaintiffs sought declaratory and injunctive relief pursuant to 42 U.S.C. SS 1983 and 1988 and 28 U.S.C. SS 2201 and 2202 with one goal in mind: to prevent the Act from taking effect. The Attorney General, the New Jersey Board of Medical Examiners and the Commissioner of the HSS all declined to defend the Act. Accordingly, the Legislature sought leave to intervene for that purpose, and leave was granted. See Planned Parenthood of Cent. N.J. v. Verniero, No. 97-6170, slip. op. at 1 (D.N.J. Dec. 24, 1997) (Order). On December 16, 1997, the District Court entered a Temporary Restraining Order preventing enforcement of the Act pending a hearing on the application for an injunction. After a four-day hearing, at which the three individual plaintiff physicians and four defense witnesses testified, the District Court permanently enjoined enforcement of the Act,

and the Legislature appealed. We exercise appellate jurisdiction pursuant to 28 U.S.C. S 1291.

B. The Act

New Jersey's partial-birth abortion statute prohibits "an abortion in which the person performing the abortion partially vaginally delivers a living human fetus before killing the fetus and completing the delivery." N.J.S.A. S 2A:65A-6(e). The Act purports to define the phrase "vaginally delivers a living human fetus before killing the fetus" to mean "deliberately and intentionally delivering into the vagina a living fetus, or a substantial portion thereof, for the purpose of performing a procedure the physician or other health care professional knows will kill the fetus, and the subsequent killing of the human fetus." N.J.S.A. S 2A:65A-6(f). The Act provides a single exception whereby this otherwise banned procedure may be used: namely, when the procedure "is necessary to save the life of the mother whose life is endangered by a physical disorder, illness or injury." N.J.S.A. S 2A:65A-6(b).

Unlike almost all of the "partial-birth abortion" statutes enacted throughout the country, the Act is civil, not criminal. The penalties for violations of the Act are, nonetheless, severe. Under the Act, those who perform "partial-birth abortions" are subject to immediate professional license revocation and a $25,000 fine for each abortion performed. See N.J.S.A. S 2A:65A-6(c). An ambulatory health care facility at which such a banned procedure takes place is also subject to the immediate revocation of its license. See N.J.S.A.S 2A:65A-6(d). A woman upon whom a "partial-birth abortion" is performed, however, is not subject to any penalties. See Senate Women's Issues, Children and Family Services Committee Statement, No. 2409-L. 1997, c. 262.

C. Facts

Because the District Court's findings of fact are not clearly erroneous, see Lanning v. Southeastern Pa. Transp. Auth., 181 F.3d 478, 481 (3d Cir. 1999), we will draw heavily from its opinion in setting forth those facts below.

5

1. Abortion Procedures

The term "partial-birth abortion" does not exist in medical parlance and, thus, scrutiny of the Act depends largely on determining precisely what abortion procedure or procedures the Act prohibits and whether this prohibition creates an undue burden on a woman's right to an abortion. It is, therefore, necessary to describe and examine abortion procedures generally recognized by the medical community, a description and examination that will, of necessity, be somewhat graphic. Relying upon expert testimony, the District Court detailed several abortion procedures: (1) suction curettage; (2) dilation and evacuation ("D&E"); (3) intact dilation and extraction ("D&X"); (4) induction and installation; (5) hysterotomy; and (6) hysterectomy.2

Ninety percent of all abortions are performed during the first trimester of pregnancy. Suction curettage, also known as vacuum aspiration, is the standard procedure forfirst trimester abortions. During this procedure, a physician mechanically dilates the cervix and then inserts a cannula -- a hollow tube with blunt openings -- into the uterus. The cannula is attached to a vacuuming device and suction is used to remove the uterine contents, including the amniotic fluid, the fetus and the placenta. Afterwards, the physician may scrape the uterine walls to ensure that the uterus is fully evacuated. The fetus may be intact or disarticulated, meaning dismembered, when it is suctioned out of the uterus and through the cervix and vaginal canal. In addition, at times, part of the intact fetus may be in the vagina and part in the uterus, or a disarticulated part of the fetus may be in the vagina while the remainder is in the uterus. In either of these situations, the fetus may still have a heartbeat.

_____

2. These descriptions of the procedures are consistent with the description utilized by the American College of Obstetricians and Gynecologists ("ACOG"), a non-profit professional association of physicians specializing in women's health care and representing approximately 95% of all board-certified obstetricians and gynecologists practicing in the United States. ACOG is appearing as amicus curiae in this action.

The dilation and evacuation ("D&E") procedure is performed during the second trimester, between thirteen and twenty weeks measured from the first day of the woman's last menstrual period ("lmp"). Eighty to ninety percent of the abortions performed after the first trimester are D&E procedures. During the D&E, the physician dilates the cervix either mechanically or by using osmotic dilators which are inserted into the cervical canal twelve to thirty hours prior to the procedure. Once the cervix is sufficiently dilated, the physician uses light suction to rupture the amniotic sac. Then, largely without the benefit of seeing the contents of the uterus, the physician inserts forceps into the uterus, grasps hold of a part of the fetus and extricates it from the woman's body. This process is repeated until the entire fetus has been removed. The physician then uses suction to remove the placenta.

During this procedure, the fetus may be removed from the uterus and pulled through the cervix and the vaginal canal either intact or disarticulated. The amount of disarticulation depends upon the width of the dilated cervix as well as the gestational stage of the fetus because the fetus is more prone to disarticulate at earlier stages of the pregnancy. As with the suction curettage procedure, the D&E may result in a situation in which part of an intact fetus is in the vagina and part in the uterus or a disarticulated part of the fetus is in the vagina while the remainder of the fetus is in the uterus. In either circumstance, the fetus may still have a heartbeat.

After fourteen weeks lmp, the physician may use a similar procedure in which he or she grasps the fetus by its feet or legs and attempts to draw the fetus intact through the cervix and into the vagina. The fetal head may become stuck in the internal cervical os requiring the physician to apply suction to dislodge the head. If the suction does not work, the physician must either disarticulate the fetal head and deliver it apart from the body or collapse the head in order to deliver the fetus intact. The fetus may still have a heartbeat while its body is in the vagina and the head lodged in the cervix. This procedure is termed an"intact dilation and extraction" ("D&X") by the American College of Obstetricians and Gynecologists ("ACOG"). Although the

7

D&X has not been the subject of clinical trials or peer reviewed studies, the District Court concluded that the procedure may pose a lesser risk of cervical laceration and uterine perforation because the procedure requires less instrumentation than the D&E and fewer entries into the uterus. In addition, the D&X generally results in an intact fetus which is often desirable for diagnostic purposes.

During the second trimester, but generally not before sixteen weeks lmp, induction abortions account for the majority of abortions performed which are not D&E abortions. During an induction procedure, the physician dilates the cervix twelve to twenty-four hours before medically inducing labor. Installation abortions, a subset of inductions, involve the injection of a lethal substance, such as sodium chloride or concentrated urea, into the uterus either through the abdomen or through the cervix to cause uterine contractions. Labor can last anywhere from ten to thirty hours, resulting in the delivery of an intact fetus. During an induction abortion, the fetus may die before delivery. For example, the fetus may die in the uterus by the injection of a lethal substance or by uterine contractions. In addition, the fetus may expire during delivery if, for example, the fetus becomes entangled in the umbilical cord, or the fetal head becomes lodged in the internal cervical os, requiring the physician to disarticulate the head and deliver it separate from the body or deflate the head in order to remove the intact fetus. Circumstances requiring an expeditious delivery, such as maternal hemorrhaging, may result in disarticulation. In addition, the physician may need to sever the umbilical cord if the fetus becomes entangled in it during delivery. In any of these circumstances, fetal death may occur while the fetus is partially in the uterus and partially in the vagina.

The two remaining methods of abortion are hysterotomy and hysterectomy, procedures which are very rarely performed for purposes of aborting a fetus. A hysterotomy is a pre-term cesarean section in which the fetus is delivered through an incision in the abdomen. A hysterectomy is the complete removal of the uterus. Both procedures carry a higher risk of maternal death than other methods of abortions due to the possibility of hemorrhage. The hysterectomy, of course, renders the woman sterile.

8

2. Plaintiffs

Planned Parenthood, an ambulatory health care facility
licensed pursuant to N.J.A.C. S 8:43A-1.3, provides vacuum
aspiration abortions up to fourteen weeks lmp. Plaintiffs
Gerson Weiss, M.D., David Wallace, M.D., and Herbert
Holmes, M.D., are licensed to practice medicine in the State
of New Jersey. Dr. Weiss, a professor in and Chairman and
Chief of Service of the Department of Obstetrics and
Gynecology at the University of Medicine and Dentistry of
New Jersey-New Jersey Medical School ("UMDNJ"), oversees
the provision of all obstetrical and gynecological care at the
hospital, including abortions up through eighteen weeks
lmp. He established a training program and teaches
residents the full range of obstetric and gynecological care,
including abortions. He is also Director of the Center for
Reproductive Medicine, which is affiliated with Hackensack
Hospital. Dr. Weiss is board-certified in obstetrics and
gynecology, and has a subspecialty board-certification in
reproductive endocrinology. He has performed abortions
since 1968 and has personally performed between 500 and
1000 abortions using the vacuum aspiration and D&E
methods. He has also performed hysterotomy abortions.

Dr. Wallace is the President of the Medical Staff at
Monmouth Medical Center, which is affiliated with the St.
Barnabas Health Care System in Long Branch, New Jersey.
He is Chairman of the Department of Obstetrics and
Gynecology and Director of the residency program. Dr.
Wallace is board-certified in obstetrics and gynecology, and
is eligible for certification in maternal-fetal medicine. Since
1980, Dr. Wallace has performed between 1,500 and 2,000
abortions and currently performs about fifty abortions
annually. He performs abortions through twenty-three
weeks lmp, supervises abortions, and teaches abortion
procedures. He utilizes both the vacuum aspiration and the
D&E methods.

Dr. Holmes is a clinical associate professor of obstetrics
and gynecology at UMDNJ, where he is the primary
physician performing abortions. He is also an attending
surgeon at Newark Beth Israel Hospital with primary
responsibility for abortions. Annually, he performs 400 to
500 first trimester vacuum aspiration abortions and 200 to

300 second trimester D&E abortions up through eighteen weeks lmp. He performs D&E abortions after eighteen weeks lmp where there is a demonstrable fetal abnormality. Dr. Holmes was previously affiliated with United Hospitals in Newark, New Jersey, where he performed induction and installation abortions through twenty weeks lmp, and through twenty-four weeks lmp in the case of fetal abnormality or risk to the mother's health.

Each physician was qualified to testify as an expert in obstetrics and gynecology, including abortion procedures, and did so during the hearing before the District Court.

II. DISCUSSION

The order of the District Court holding the Act unconstitutional and granting a permanent injunction is the focus of the parties' attention, and ours. We review that order under an abuse of discretion standard. See American Civil Liberties Union of N.J. v. Black Horse Pike Reg'l Bd. of Educ., 84 F.3d 1471, 1476 (3d Cir. 1996). "An abuse of discretion exists where the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." Id. (citation omitted). In addition to the constitutionality of the Act, however, several other issues -- standing, ripeness, and abstention -- have been raised by the Legislature. While recognizing that generally such issues are discussed sooner rather than later, an analysis of these issues is directly informed by the scope of the Act. See Audio Tape of Oral Argument before Court of Appeals for the Third Circuit (Nov. 19, 1999) (on file with Court) (statement by the attorney for the Legislature that the "central issue in this case" is the scope of the Act and "every issue in this case turns on the answer to that question: abstention, ripeness, vagueness, undue burden, everything else . . ."). We, therefore, will defer our consideration of these issues until after we have considered the Act's constitutionality -- or lack thereof. 3
_____

3. We reject out of hand two additional issues summarily raised by the Legislature. The Legislature asserts that the District Court abused its

10

A. Constitutionality of Act

1. The Act is Void for Vagueness

The District Court found the Act unconstitutionally vague because it failed to define with any certainty the conduct that is proscribed. The Legislature contends that the District Court erred in so finding because although some terms may be ambiguous, the Court confused the concepts of ambiguity and vagueness and, in any event, should have narrowed the scope of the Act instead of striking down the Act in its entirety. Conceding that D&E, suction curettage and induction abortions are constitutionally protected, the Legislature argues that, if construed narrowly, the Act simply bans the D&X procedure and not conventional methods of abortion. The Legislature also points to the intent element contained within the Act which purportedly "clearly" restricts its scope. The District Court found that the Act was not readily susceptible to a narrowing interpretation and that the intent element does not cure the vagueness concerns. We agree.

The Supreme Court has been explicit:

> It is a basic principle of due process that an enactment
> is void for vagueness if its prohibitions are not clearly
> defined. Vague laws offend several important values.
> First, because we assume that man is free to steer
> between lawful and unlawful conduct, we insist that
> laws give the person of ordinary intelligence a

_____

discretion in: (1) excluding materials, such as newspaper articles, that illustrate the public debate surrounding partial birth abortion, as well as testimony of witnesses that the fetus is a human being and able to experience pain; and (2) refusing to completely correct the transcripts of the hearings. After examining the record, we find no abuse of discretion in disallowing the materials and testimony because, among other reasons, they were not relevant to the issue before the Court, i.e. the constitutionality of the Act. As for the transcripts, the District Court did grant in part the Legislature's motion to amend the transcripts to adequately reflect significant deviations but refused to order all of the Legislature's proposed corrections, some of which included replacing "gonna" with "going to." App. at 1250. We find no error, much less an abuse of discretion.

11

reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.

Grayned v. City of Rockford, 408 U.S. 104, 108 (1972) (footnotes omitted). The level of specificity required to pass constitutional muster is informed by the subject of the statute. If a statute is so nonspecific as to create uncertainty regarding the exercise of a constitutionally protected right, such as a woman's right to abortion, a higher degree of clarity is required. See Colautti v. Franklin, 439 U.S. 379, 390 (1979), overruled in part on other grounds, Webster v. Reproductive Health Servs., 492 U.S. 490 (1989); see also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499 (1982) (evaluating a civil statute for vagueness and stating that "perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights"). Indeed, in Colautti, the Supreme Court struck down provisions of the Pennsylvania Abortion Control Act, stressing the ambiguous nature of both the viability determination portion of the statute as well as the standard of care provision. See Colautti, 439 U.S. at 401. The Court held that the statute was impermissibly vague because liability was conditioned "on confusing and ambiguous criteria" which "present[ed] serious problems of notice, discriminatory application, and [a] chilling effect on the exercise of constitutional rights." Id. at 394.[4]

In addition, two basic tenets of statutory construction are relevant to our analysis. Statutes are to be accorded a presumption of constitutionality and, under both state and federal canons of statutory construction, a statute may be

_____

4. We note that the Court found the statute to be vague on its face without mention of First Amendment concerns. See Colautti, 439 U.S. at 390. This in and of itself disposes of the Legislature's contention that plaintiffs cannot bring a facial challenge on vagueness grounds in a case such as this unless the First Amendment is implicated.

narrowed in order to fall within the confines of the Constitution but only if, an "if " which is important here, it is "readily susceptible" to such a limiting construction. See Reno v. American Civil Liberties Union, 521 U.S. 844, 884 (1997) ("[i]n considering a facial challenge, this Court may impose a limiting construction on a statute only if it is `readily susceptible' to such a construction"); Hamilton Amusement Ctr. v. Verniero, 156 N.J. 254, 280, 716 A.2d 1137, 1149 (1998) (holding that New Jersey statute must be construed "in a constitutional manner if it is reasonably susceptible to such a construction"), cert. denied, 527 U.S. 1021 (1999). We may not, however, "rewrite a state law to conform it to constitutional requirements." Virginia v. American Booksellers Ass'n, Inc., 484 U.S. 383, 397 (1988).

The Act seeks to prevent physicians from performing "partial-birth abortions." In medical parlance, as we have noted above, that term does not exist. The subject of the ban, then, must be determined from the text of the Act. See Eubanks v. Stengel, 28 F. Supp. 2d 1024, 1033 (W.D. Ky. 1998) (noting that in examining Kentucky's partial birth abortion statute, "the Court must consider the constitutionality of the group of words, selected and arranged by the General Assembly, presumably intended to ban whatever they encompass."). According to the Act, a partial-birth abortion is "an abortion in which the person performing the abortion partially vaginally delivers a living human fetus before killing the fetus and completing the delivery." N.J.S.A. S 2A:65A-6(e). The Act thereafter purports to define "vaginally delivers a living human fetus before killing the fetus" as "deliberately and intentionally delivering into the vagina a living fetus, or a substantial portion thereof, for the purpose of performing a procedure the physician or other health care professional knows will kill the fetus, and the subsequent killing of the human fetus." N.J.S.A. S 2A:65A-6(f). Discerning the meaning of all of this is a Herculean task and one which illustrates that the statutory definition of partial birth abortion is so vague as to encompass almost all forms of abortion.

First, the term "partially vaginally delivers" could reasonably describe the delivery of an intact fetus partially into the vaginal canal or the delivery of a fetal part into the

13

vaginal canal. All abortion procedures, save the hysterotomy and hysterectomy which are typically not vaginal deliveries, could, therefore, be encompassed within this definition because during each of the procedures a fetus may be partially delivered into the vaginal canal and thereafter killed. For instance, during suction curettage, when the fetus is suctioned out of the uterus and through the cervix and vaginal canal, a portion of the fetus may remain in the uterus, effectuating a partial vaginal delivery. In addition, during a D&E, parts of the fetus are pulled out of the uterus and disarticulated, again effectuating a partial vaginal delivery. Finally, during an induction, the fetus may become entangled in the umbilical cord or the head may become lodged in the internal cervical os resulting in the fetus being partially in the uterus and partially in the vaginal canal when the umbilical cord is cut or the head is collapsed. See Little Rock Family Planning Services, P.A. v. Jegley, 192 F.3d 794, 798 (8th Cir. 1999) (holding that use of term "partially" in Arkansas partial birth abortion statute means that "[a] physician who, as part of a D&E procedure, or as part of a suction-curettage procedure, brings an arm or a leg or some other part of a living fetus out of the uterus into the vagina will violate the Act").

Contrary to the Legislature's protestations, following the phrase "partially vaginally delivers" with "a living human fetus" does not narrow the reach of the Act. All experts in this case agree that the term "living" simply means that the fetus has a heartbeat, a far cry, indeed, from much of the rhetoric surrounding the partial birth abortion debate as to what "living" means in the context of partial birth abortion statutes. It is undisputed that a fetus has a heartbeat from as early as seven weeks lmp until birth, thus encompassing the time period during which almost all abortions are performed. In addition, both an intact and a disarticulated fetus may have heartbeats and, therefore, be "living." The record amply supports the District Court's finding that during a suction curettage, a D&E, or an induction procedure, the fetus may very well have a heartbeat while part of the fetus is delivered into the vaginal canal and part remains in the uterus.

Moreover, far from clarifying anything, use of the term "living human fetus" adds to the Act's constitutional

14

uncertainty because it does not draw the line at viability, as the Supreme Court has done. In Roe, the Supreme Court stressed that the state's interest in potential life may reach the "compelling" point at viability, or when the fetus is "potentially able to live outside the mother's womb, albeit with artificial aid." Roe v. Wade, 410 U.S. 113, 160, 163 (1973). Thus, prior to viability, the state may not interfere with the physician's decision, in consultation with his or her patient, that the pregnancy should be terminated. See id. at 163. After viability, however, the state may proscribe abortions altogether except when necessary to protect the life or health of the mother. See id. at 163-64. Although the Court in Casey subsequently adopted an undue burden approach when evaluating abortion regulations, it explicitly reaffirmed Roe's emphasis on viability, holding that before viability the state "may not prohibit any woman from making the ultimate decision to terminate her pregnancy[,]" while post-viability abortion may be proscribed so long as there are exceptions for the life and health of the woman. See Planned Parenthood of Southeastern Pa. v. Casey , 505 U.S. 833, 878-79 (1992).

A fetus typically reaches viability after about twenty-four weeks of pregnancy. See Verniero, 41 F. Supp. 2d at 492 n.4. Here, however, because a fetus may be "living" as early as seven weeks lmp, use of the term "living" instead of "viable" indicates that, contrary to the understanding of a large segment of the public and the concomitant rhetoric, the Act is in no way limited to late-term, or even mid-term, abortions. Rather, the Act is limited only to procedures which entail vaginally delivering part of a fetus from the uterus after the fetus is "living," or, in other words, after seven weeks lmp. As we have already noted, most common abortion procedures will fall within this limitation when they entail the partial delivery into the vaginal canal of a fetus that still has a heartbeat, as they usually do.

The uncertainty of the Act is further compounded by the term "substantial portion." See Carhart v. Stenberg, 192 F.3d 1142, 1150 (8th Cir. 1999) (finding the "crucial problem" with Nebraska's partial birth abortion statute to be the undefined term "substantial portion"), cert. granted in part, 120 S. Ct. 865, 68 U.S.L.W. 3338, 68 U.S.L.W.

3449 (Jan. 14, 2000) (No. 99-830). The Act prohibits vaginally delivering "a living fetus or a substantial portion thereof, for the purpose of performing a procedure the physician . . . knows will kill the fetus, and the subsequent killing of the fetus." N.J.S.A. S 2A:65A-6(f) (emphasis added). Questions immediately arise as to whether "substantial portion" is measured in terms of size or volume in relation to the remainder of the body, length of the body, functionality, or a combination of these factors. Even if "substantial portion" were only interpreted to mean size, reasonable minds may well differ as to how much of a fetus is substantial: two limbs, four limbs, at least half of its body, all but the head? Indeed, the Legislature's own witness, Dr. Bowes, testified that "substantial" may be evaluated in terms of function, length, and relative size and there could be differences of opinion between reasonable physicians as to whether a portion of a fetus is "substantial." App. at 1138. It is constitutionally impermissible to force a physician to guess at the meaning of this inherently vague term and risk losing his or her professional license and receiving a heavy fine if he or she guesses wrong.5

Indeed, the phrase "substantial portion" undermines the Legislature's assertion that the ban only prohibits the delivery of intact fetuses. Nowhere does the term"intact" appear in the Act and the record supports the conclusion that a "substantial portion" of a living fetus could well refer to a portion of a disarticulated fetus. Even reading the word "intact" into the Act, however, does not limit it to the D&X procedure because an intact fetus may be delivered during both an induction and a D&E procedure as well.

_____

5. Not only are physicians bereft of notice as to what procedures are prohibited by the Act but the vagueness of the Act increases the risk of disparate enforcement. See City of Chicago v. Morales, 527 U.S. 41, ___, 119 S. Ct. 1849, 1859 (1999) (stating that vague statutes authorize and may even encourage arbitrary and discriminatory enforcement); Graynard, 408 U.S. at 108 (same). The utter lack of clarity as to the scope of the Act raises the Due Process concern that the New Jersey Board of Medical Examiners would have virtually unfettered discretion to revoke licenses and impose fines.

16

The Legislature argues, however, that the Act's scienter requirement at least partially cures the vagueness concerns it candidly admits exist. The Act forbids a physician from "deliberately and intentionally delivering into the vagina a living fetus, or a substantial portion thereof, for the purpose of performing a procedure the physician . . . knows will kill the fetus." N.J.S.A. S 2A:65A-6(f) (emphasis added). While a scienter requirement can cure a vague statute, or at least ameliorate the vagueness, see Colautti , 439 U.S. at 395, it cannot do so here. At a minimum, to limit the scope of a statute to "deliberately and intentionally" performing a certain procedure, the procedure itself must be identified or readily susceptible of identification. See, e.g., Rhode Island Med'l Soc'y v. Whitehouse, 66 F. Supp. 2d 288, 311-12 (D.R.I. 1999) (holding that scienter requirement could not save Rhode Island's partial birth abortion statute because the "scienter requirement modifies a vague term"). Here, it is not.

Finally, the Legislature asserts that the reach of the Act is narrowed by its requirement that after the living fetus, or a substantial portion, is partially delivered into the vagina, the physician must intentionally perform a separate "procedure" which he or she knows will kill the fetus, and does so. This requirement narrows the Act, the Legislature asserts, to encompass only the D&X procedure in which the intact fetus -- again, that word "intact"-- is partially delivered into the vagina and a separate procedure is then intentionally performed whereby the fetal head is punctured and the intracranial contents suctioned, killing the fetus before delivery is completed. Because delivery is not halted to perform a separate procedure aimed at killing the fetus during a D&E, suction curettage or induction abortion (absent a complication), the Legislature argues that those abortion procedures are not prohibited by the Act.

The words of the Act simply do not support any such reading. Nowhere does the Act require that the abortion be halted while a separate procedure is performed to kill the fetus; indeed, the word "separate" does not even appear in the Act. The Act simply prohibits "deliberately and intentionally delivering into the vagina a living fetus, or a substantial portion thereof, for the purpose of performing a

17

procedure the physician . . . knows will kill the fetus . . . ." N.J.S.A. S 2A:65A-6(f). All abortions seek to terminate pregnancy and necessarily entail the intent to deliver a fetus, or a substantial portion thereof, for the purpose of killing the fetus.

Even if we were to read the word "separate" into the Act and find the Act only applicable to abortion procedures which entail the intentional delivery into the vagina of a fetus for the purpose of performing a "separate" procedure aimed at killing the fetus, however, the Act is still not limited to the D&X. It is uncontested, for example, that during a D&E, a substantial portion of the fetus may be intentionally and deliberately delivered into the vagina for the purpose of performing a procedure, such as dismemberment, which the physician knows will kill the fetus. Indeed, Dr. Wallace testified that when performing a D&E, his "goal" is to bring a part of the fetus down through the cervix because he "[does not] want to disarticulate whatever [he] has grabbed within the contents of the uterine cavity" and will only disarticulate it in the uterus if necessary. App. at 680. The purpose of this, he testified, is to avoid unnecessary passes into the uterus. See id. Also during a D&E, after a substantial portion of the fetus is delivered, the physician might be required to collapse the fetal skull in order to deliver the remainder of the fetus, a procedure he or she knows will kill the fetus. Finally, during an induction the physician may intentionally deliver the fetus into the vagina for the purpose of performing a separate procedure which will kill the fetus, such as cutting the umbilical cord or collapsing the skull to deliver the remainder of the fetus intact.

Another difficulty is that, even though treated as separate procedures, the D&E and the D&X substantially overlap given that the D&X is essentially a subset of the D&E. Generally, the only difference between the procedures is that the fetus is usually disarticulated in the D&E, while intact removal is the goal of the D&X.6  In an attempt to
_____

6. The record reflects that there can be benefits in attempting to remove an intact, rather than a disarticulated, fetus during an abortion procedure, including aiding in the diagnosis of fetal abnormalities.

18

perform a D&E, however, it is entirely possible that the physician may extract not simply a portion of the fetus but an intact fetus, thus transforming the procedure into a D&X. In addition, during both the D&E and the D&X, the head of the fetus may become lodged in the cervix, requiring the physician to collapse the head. Thus, the conduct of a physician during both procedures may be identical. Because there is no meaningful difference between the forbidden D&X procedure and the permissible and concededly constitutionally protected D&E procedure, and no reason of conviction or philosophy to prohibit the former and permit the latter, one must wonder if the true purpose of the Act is not, pure and simple, to dramatize to the public the ugly nature of abortions of all types and deter physicians from performing them.

Be that as it may, the Legislature asserts that the scienter requirement narrows the application of the Act to physicians who intend at the outset to perform a D&X, not to physicians who intend at the outset to perform a D&E which inadvertently becomes a D&X when the fetus is extracted intact instead of disarticulated. So that the intent is clear, the Legislature proposes that physicians performing abortions register with the State the particular type of abortion which, at least at the outset, they intend to perform.

Separate and apart from the fact, and fact it be, that no one would ever voluntarily register with the State that he or she intends to perform a procedure which could or would cost the physician his or her professional license, the Act does not support any such reading. It does not prohibit intentionally performing a D&X, but prohibits only the intentional delivery of a living fetus, or substantial portion thereof, for the purpose of performing a procedure that will kill the fetus and subsequent killing of the fetus. As we have explained, this prohibition could encompass a D&E, in which a physician intends to partially deliver a living fetus into the vagina, dismembers the fetus in the vagina, thereby killing the fetus, and completes delivery. See Planned Parenthood of Greater Iowa, Inc. v. Miller , 195 F.3d 386, 389 (8th Cir. 1999) (finding that scienter requirement could not save Iowa's partial birth abortion ban because it

19

could still encompass the D&E procedure); Jegley , 192 F.3d at 798 (rejecting argument that scienter requirement limits scope of Arkansas partial birth abortion statute to cover only D&X procedure); Carhart, 192 F.3d at 1150 (applying similar reasoning with reference to Nebraska partial birth abortion statute).

Finally, the Legislature argues that because New Jersey is one of the most "liberal" states in terms of abortion rights, it is "clear" that the drafters did not intend to repudiate decades of abortion rights by banning all abortions, but only intended the Act to prohibit the D&X procedure. The District Court, the Legislature continues, should have read the Act narrowly in order to effectuate this clear intent. Indeed, when the Attorney General would not defend the Act (a fact, we note, which has not escaped our attention but on which we choose not to comment), the Legislature itself appeared to do so and to declare both its intent and its request for a narrowing construction.

Despite the Legislature's protestations, it was not the role of the District Court, nor is it our role, to rewrite statutes even at the request of the Legislature. Nonetheless, because there is virtually no legislative history surrounding the enactment of the Act, and because the Legislature in its submissions to us did not even attempt to suggest what that narrowing construction could or should be, at oral argument we pressed counsel for the Legislature to specify the narrow construction which was supposedly intended by the drafters of the Act and which it calls upon us now to put in place. We received no answer, giving us no reason to believe that there is an answer. Indeed, all that we have been told, and then at but one point in the Legislature's brief, is that the Act only sought to ban a new method of abortion which

> involves the feet-first delivery of a live, intact fetus almost completely out of the mother's womb, to the point where only the head remains in the womb and the legs and lower trunk are actually outside the mother's body. At this point, the delivery is halted, the baby's skull is punctured with a scissors, and the baby's brains are sucked out with a vacuum, which collapses the skull.

Appellant Br. at 6-7.

It is shocking in the extreme that, whatever one may think of abortion in general and "partial birth abortion" in particular, this wholesale mischaracterization of what is necessarily involved in the D&X procedure and, thus, what the Act supposedly proscribes is what has unquestionably, at least in large part, inflamed public opinion. This, of course, is the result of "partial birth abortion" having no clear definition and, thus, no clear meaning.

But mischaracterization aside, the words of the Act could not be more divergent from the Legislature's description of what it purported to ban. The Act nowhere specifies that the fetus must be intact, that it be delivered feet-first, that only the head remain in the womb when delivery is halted, that the legs and the lower trunk be outside the mother's body, that the skull be punctured with a scissors, or that the brains be sucked out with a vacuum in order to collapse the skull. Instead, the Act is filled with vagaries such as "partially vaginally delivers," "substantial portion," and "a procedure the physician . . . knows will kill the fetus."

If the Legislature intended to ban only the D&X procedure, it could easily have manifested that intent either by specifically naming that procedure or by setting forth the medical definition of D&X utilized by the ACOG, namely: "(1) deliberate dilation of the cervix, usually over a sequence of days; (2) instrumental conversion of the fetus to a footling breech; (3) breech extraction of the body excepting the head; and (4) partial evacuation of the intracranial contents of a living fetus to effect vaginal delivery of a dead but otherwise intact fetus." App. at 1328. We render no opinion as to whether a statute explicitly prohibiting the performance of a D&X or containing the ACOG definition would pass constitutional muster. Cf. Women's Med'l Prof 'l Corp. v. Voinovich, 130 F.3d 187, 190 (6th Cir. 1997) (enjoining Ohio statute specifically prohibiting performance of "a dilation and extraction procedure upon a pregnant woman" because definition of procedure set forth in the statute encompasses D&E procedure), cert. denied , 523 U.S. 1036 (1998); Planned Parenthood of Wis. v. Doyle, 162 F.3d 463, 471 (7th Cir. 1998) (commenting that "[t]he

21

singling out of the D&X procedure for anathematization seems arbitrary to the point of irrationality"). We note only that naming the procedure or utilizing clear medical terminology to define that procedure for the physicians at whom the Act is aimed would at least have indicated the Legislature's supposed intent to simply ban the D&X.

There is simply no excuse for the failure of the Legislature to have done so or for the incurably vague Act which resulted from that failure. Indeed, we, as was the District Court, are left to wonder whether the drafters chose a path of deliberate ambiguity, coupled with public outrage based largely on misinformation, in an attempt to proscribe legitimate abortion practices. Cf. Eubanks, 28 F. Supp. 2d at 1036 (in striking down a partial birth abortion statute, the Court noted that "[t]he legislature focused directly on protected activity in a manner which everyone knew might be unconstitutional. The legislature could have passed a statute of more limited reach and still achieve its supposed objective. Instead, it decided to go farther. Indeed, as is sometimes the case in controversial issues, the legislature seems to have striven for, in Justice Frankfurter's words, a `purposeful ambiguity.' ") (citation omitted).

The Act, pure and simple, is not susceptible much less "readily susceptible" to a narrowing construction. To narrow it to prohibit only the D&X procedure, as the Legislature now says was the sole procedure it intended to ban, would entail a complete rewriting, if not "brute force." Unlike the Seventh Circuit, we decline to use such brute force in an attempt to save the Act, and reject out of hand that Court's observation that "courts do it all the time." Hope Clinic v. Ryan, 195 F.3d 857, 865 (7th Cir. 1999) (en banc), petition for cert. filed (U.S. Jan. 14, 2000) (Nos. 99-1152, 1156). As the dissent in Hope Clinic so aptly stated, it would be an act of "judicial hubris" to narrow the statute to the D&X when the drafters of the statute decided not to use that term, "preferring a vaguer term intended to be broader."[7] Id. at 866 (Posner, C.J., dissenting); see also

_____

7. Numerous courts throughout the country have stuck down similarly worded statutes after finding them unconstitutionally vague. See, e.g., Rhode Island Med'l Soc'y v. Whitehouse, 66 F. Supp. 2d 288, 310-12

Carhart v. Stenberg, 192 F.3d at 1150 (striking down Nebraska's partial birth abortion statute and noting that while court must give statute a construction that avoids constitutional doubts, it "cannot, however, twist the words of the law and give them a meaning that they cannot reasonably bear").

## 2. The Act Creates an Undue Burden

In addition to finding the Act void for vagueness, a finding with which we wholeheartedly agree, the District Court determined that, under Roe and Casey, the Act unduly burdened a woman's constitutional right to obtain an abortion because: (1) the language of the Act is so broad that it covers many conventional methods of abortion; (2) the Act contains no health exception, constraining the physician from performing a procedure which, in his or her discretion, would preserve the health of the woman; and (3) the Act's exception for the life of the woman is inadequate. The Legislature contends that the District Court erred because Roe and Casey do not apply, and, even if they do, the Act creates no undue burden. We will address only the first ground found by the District Court, and we do so because the reasons which support that ground so closely track the reasons which compelled our conclusion that the Act is void for vagueness.

A woman has a constitutional right under the Due Process Clause of the Fourteenth Amendment to choose to

_____

(D.R.I. 1999) (holding partial birth abortion statute to be unconstitutionally vague); Richmond Med'l Ctr. for Women v. Gilmore, 55 F. Supp. 2d 441, 493-500 (E.D. Va. 1999) (same); Causeway Med'l Suite v. Foster, 43 F. Supp. 2d 604, 615-19 (E.D. La. 1999) (same); Evans v. Kelley, 977 F. Supp. 1283, 1304-11 (E.D. Mich. 1997) (same); see also Women's Med'l Prof 'l Corp. v. Voinovich, 130 F.3d 187 (6th Cir. 1997) (finding statute explicitly prohibiting the dilation and extraction method of abortion to be impermissibly vague because it covered D&E procedure as well), cert. denied, 523 U.S. 1036 (1998); but see Hope Clinic v. Ryan, 195 F.3d 857, 869 (7th Cir. 1999) (rejecting vagueness challenges to Illinois and Wisconsin partial birth abortion statutes but recommending that the district court enter "precautionary injunctions" prohibiting the statutes from applying to D&E or induction abortions), petition for cert. filed (U.S. Jan. 14, 2000) (No. 99-1152).

terminate her pregnancy. See Roe v. Wade, 410 U.S. 113, 153 (1973). While affirming the essential holding in Roe that a state may not prohibit a woman from choosing to terminate her pregnancy prior to viability, the Supreme Court subsequently rejected the rigidity of Roe 's trimester framework. See Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 870 (1992). Instead, the Casey Court determined that before viability, the state may regulate abortion but only insofar as it does not create an undue burden on a woman's ability to choose to have an abortion. See Casey, 505 U.S. at 874 (stating that "[o]nly where a state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause"). In evaluating state regulations, the Court explained that "[a]n undue burden exists, and therefore a provision of law is invalid, if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." Id. at 878. Although the state may freely regulate, and even proscribe, abortion after viability, any such restriction must still contain an exception "where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." Id. at 879 (citing Roe, 410 U.S. at 164–65).

Before examining whether the Act creates an undue burden, and finding that it surely does, we will briefly address the Legislature's threshold argument that Roe and Casey do not apply to New Jersey's "partial-birth abortion" statute because: (1) the applicable test is that enunciated in United States v. Salerno, 481 U.S. 739, 745 (1987), and plaintiffs' facial challenge fails to meet Salerno's requirement that no set of circumstances exists under which the Act would be valid; and (2) "partial-birth abortion" is not a Casey-protected abortion procedure, but rather is tantamount to infanticide. We join numerous other courts in rejecting both arguments.

First, citing Salerno, the Legislature asserts that in order to mount a facial challenge to an Act, plaintiffs must establish that no set of circumstances exists under which the Act would be valid. See Salerno, 481 U.S. at 745. According to the Legislature, plaintiffs cannot meet this

24

burden because, as narrowly construed -- assuming it could be narrowly construed -- the Act is constitutional as applied to them given that they do not perform the D&X procedure.

But as several courts, including our own, have noted, the Casey Court muted the Salerno requirement in the abortion context by stating that a statute regulating abortion is facially invalid if "in a large fraction of the cases in which [the statute] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." Casey, 505 U.S. at 895. On remand to this Court, we immediately recognized that the Supreme Court set a"new standard for facial challenges to pre--viability abortion laws" by requiring only that "a plaintiff show an abortion regulation would be an undue burden `in a large fraction of the cases.' " Planned Parenthood of Southeastern Pa. v. Casey, 14 F.3d 848, 863 n.21 (3d Cir. 1994) (citing Casey, 505 U.S. at 895, and noting that Salerno was the "old rule"). Numerous courts have recognized the substitution of the Casey standard for the Salerno test. See, e.g., Women's Med'l Prof 'l Corp. v. Voinovich, 130 F.3d 187, 194-97 (6th Cir. 1997) (stating that "[a]lthough Casey does not expressly purport to overrule Salerno, in effect it does"), cert. denied, 523 U.S. 1036 (1998); Jane L. v. Bangerter, 102 F.3d 1112, 1116 (10th Cir. 1996) (noting that Supreme Court did not apply Salerno in Casey and that "the proper test after Casey is the `undue burden' standard applied by the Court in that case"), cert. denied, 520 U.S. 1274 (1997); Planned Parenthood, Sioux Falls Clinic v. Miller, 63 F.3d 1452, 1456-58 (8th Cir. 1995)("We choose to follow what [Casey] actually did -- rather than what it failed to say -- and apply the undue-burden test. It is true that the Court did not expressly reject Salerno's application in abortion cases, but it is equally true that the Court did not apply Salerno in Casey."), cert. denied , 517 U.S. 1174 (1996); but see Causeway Med'l Suite v. Ieyoub, 109 F.3d 1096, 1102- 04 (5th Cir.) (finding it "ill-advised" to assume that the Supreme Court abandoned Salerno in Casey  but invalidating statute under either standard), cert. denied, 522 U.S. 943 (1997).

Thus, in order to mount a facial challenge to an abortion regulation, a plaintiff need not establish that no set of

25

circumstances exists under which the Act would be valid. Rather, a plaintiff must show that an abortion regulation would be an undue burden in a large fraction of the cases in which that regulation is relevant.

Second, the Legislature contends that Roe and Casey are inapplicable because they apply only to aborting the "unborn," while the Act attempts to prohibit "the deliberate killing of a living human being who has almost completed the process of birth." Appellant Br. at 45. Because, the argument goes, the Act pertains to fetuses that are in the process of being "born" and that are more outside than inside the uterus when they expire, the procedure is more akin to infanticide than abortion. Indeed, the Legislature stresses, the Supreme Court in Roe deliberately left open the possibility of protecting "partially born" human beings when it declined to review a Texas statutory provision criminalizing "destroy[ing] the vitality or life in a child in a state of being born and before actual birth." Roe, 410 U.S. at 118 n.1.

The Legislature's argument that Roe and Casey are inapplicable to "partial-birth" abortion procedures because such procedures are infanticide rather than abortion is based on semantic machinations, irrational line-drawing, and an obvious attempt to inflame public opinion instead of logic or medical evidence. Positing an "unborn" versus "partially born" distinction, the Legislature would have us accept, and the public believe, that during a "partial-birth abortion" the fetus is in the process of being "born" at the time of its demise. It is not. A woman seeking an abortion is plainly not seeking to give birth.

Moreover, that the life of the fetus is terminated when a "substantial portion" has passed through the cervix and is in the vaginal canal, does not without more transform an abortion procedure into infanticide. Again, the medical evidence clearly indicates that in many conventional abortion procedures the fetus may be killed, i.e. the heart ceases beating, when a substantial portion of the fetus (whether it be disarticulated limbs or part of the body of the fetus) is in the vagina and a portion remains in the uterus. In what can only be described as a desperate attempt to circumvent over twenty-five years of abortion

26

jurisprudence, the Legislature would draw a line based upon the location in the woman's body where the fetus expires. Establishing the cervix as the demarcation line between abortion and infanticide is nonsensical on its face as well as inaccurate because that line may be crossed in any number of abortion procedures which the Legislature concedes are constitutionally protected. While there are unquestionably numerous ethical, philosophical, and moral issues surrounding abortion, we are unpersuaded that these issues -- or our legal analysis -- should turn on where in the woman's body the fetus expires during an abortion.

Finally, the Legislature's reliance on the fact that the Supreme Court in Roe did not review a provision of the Texas Penal Code entitled "Destroying unborn child" is misplaced. In Roe, the Supreme Court noted in a footnote that numerous provisions of the Texas Penal Code, including the above mentioned provision, were not challenged by the parties. See Roe, 410 U.S. at 118 n.1. The fact that the Supreme Court did not sua sponte review a provision no party asked it to review says nothing about its position on that provision or on this issue.

In any event, the Legislature neglected to cite the remainder of the Texas statutory provision which clearly illustrates its inapplicability to the situation at hand. In full, that provision states that:

> Whoever shall during parturition of the mother destroy the vitality or life of a child in a state of being born and before actual birth, which child would otherwise have been born alive, shall be confined in the penitentiary for life or for not less than five years.

Roe, 410 U.S. at 118 n.1 (quoting Article 1195 of Chapter 9 of Title 15 of the Texas Penal Code)(emphasis added). By its own terms, then, the Texas provision applies explicitly to killing the fetus during parturition, or during the process of giving birth, not during an abortion procedure. Furthermore, the provision applies only where the child would otherwise be born alive. Absolutely nothing in the Act before us restricts its application to circumstances where the child would otherwise be born alive.

27

Quite simply, the one thing that is clear about the Act is that the drafters sought to restrict abortion. The Act explicitly states that " `partial-birth abortion' means an abortion" encompassing the conduct specified in the Act. N.J.S.A. S 2A:65A-6(e). Indeed, if the abortion procedure the Legislature now tells us it purported to ban were tantamount to infanticide, it would have been criminalized in the Act itself or in State homicide statutes, and the women upon whom this procedure is performed would not have been immunized from liability. The Legislature's attempt to label the Act a birth, instead of an abortion, regulation is nothing more than an effort to cloud the issues and avoid clear precedent. As an abortion regulation, the Act is subject to the analytical framework of Roe and Casey.

Applying the principles of Roe and Casey , it is clear that the Act is unconstitutional because it creates an undue burden on a woman's right to obtain an abortion. As Casey teaches, an abortion regulation creates an undue burden, and hence is invalid, "if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." Casey, 505 U.S. at 878. The Act erects a substantial obstacle because, as already discussed in great detail, it is so vague as to be easily construed to ban even the safest, most common and readily available conventional pre- and post-viability abortion procedures. Separate and apart from whether such a widespread proscription was intended by the drafters, because physicians are unable to determine precisely what the Act bans, they will be chilled from performing suction and curettage, D&E and induction abortions in order to avoid the risk of license revocation and fines. The Court has long recognized that ambiguous meanings cause citizens to " `steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked." Baggett v. Bullitt, 377 U.S. 360, 372 (1964) (citation omitted). Indeed, Drs. Weiss, Wallace, and Holmes testified that they would "stop performing all abortions" if the Act were to go into effect because they were unsure of

28

what conduct would fall within its confines. See Verniero, 41 F. Supp. 2d at 499.8

And if physicians who continued to perform abortions were to take steps to avoid the reach of the Act by, for example, killing the fetus by insertion of a toxic substance into the uterus or limiting their practices to hysterectomies and hysterotomies, the attendant health risks to women would significantly increase. Dr. Weiss testified that injecting a toxic substance such as digitalis or a high concentration of potassium into the heart of the fetus to ensure its demise before it is removed from the womb is usually not done because of the increased health risks to the woman. See App. at 484. Such a procedure requires injecting a sizeable needle either through the cervix and into the uterus or through the abdomen into the uterus. In addition, because the fetus is relatively small and oftentimes shifting, it is difficult, even with the aid of ultrasound, to inject the substance into the heart of the fetus. Such a procedure "increase[s] the chance of damaging the woman, increase[s] the risk of infection and even potentially increase[s] the risk of inducing or instill[ing] toxic substances into her." Id. Moreover, as the District Court found, injection of a toxic substance carries the risk of hemorrhage and is contraindicated for women who are obese. Verniero, 41 F. Supp. 2d at 500.

Performing a D&E by disarticulating the fetus while it is completely within the uterus and then waiting for the heartbeat to cease in order to avoid the tentacles of the Act would also increase the health risk to the woman by increasing the length of the procedure. Moreover, as Dr. Weiss testified, "[t]he last thing [a doctor] would like to do is disarticulate an advanced fetus and leave it in the uterus because that would run the risk of causing additional damage to the woman [due to sharp edges of bone potentially perforating the uterus]." Id. at 486.

_____

8. And, of course, were physicians in New Jersey to stop performing these methods of abortion, women would be forced to go elsewhere to obtain procedures to which they are constitutionally entitled. Not only would this interfere with a woman's right to privacy and her relationship with her doctor, but it could create a wholly unnecessary risk to the woman's health or life due to delay.

29

Finally, aside from the sheer absurdity of performing only hysterotomies and hysterectomies in order to avoid the Act, those procedures carry an enhanced risk of morbidity and mortality to the woman due to the incidence of hemorrhage. See Verniero, 41 F. Supp. 2d at 485. In addition, a hysterectomy renders the woman sterile. Absent an independent reason such as cervical cancer to perform these procedures, they are, therefore, rarely used as abortion techniques.

The increased risk of injury or death to the woman by attempting to ensure fetal demise in utero, or sterilization in the case of hysterectomies, clearly constitutes an undue burden. Indeed, the District Court found -- afinding certainly not clearly erroneous -- that the D&X may be a relatively safer second trimester procedure because it involves fewer entries into the uterus, thereby creating fewer risks of cervical laceration and uterine perforation. See Verniero, 41 F. Supp. 2d at 485.

In sum, the Act's chilling effect on a woman's ability to obtain a conventional and constitutionally permissible method of abortion, coupled with the attendant health risks, creates an undue burden under Casey and, thus, renders the Act unconstitutional.9 In so finding, we need

_____

9. Our conclusion is consistent with those of numerous other courts which have struck down similarly worded partial birth abortion statutes because they created an undue burden. See, e.g. , Little Rock Family Planning Services v. Jegley, 192 F.3d 794, 798 (8th Cir. 1999) (holding Arkansas's partial birth abortion statute unconstitutional because it created an undue burden by encompassing D&E and suction curettage procedures); Carhart v. Stenberg, 192 F.3d 1142, 1151 (8th Cir. 1999) (holding Nebraska's partial birth abortion statute to be unconstitutional because it prohibited most common second trimester abortions, thereby creating undue burden), cert. granted in part , 120 S. Ct. 865, 68 U.S.L.W. 3338, 68 U.S.L.W. 3449 (Jan. 14, 2000) (No. 99-830); Planned Parenthood of Greater Iowa v. Miller, 195 F.3d 386, 388 (8th Cir. 1999) (holding Iowa's partial birth abortion statute unconstitutional because it banned D&E, and in some circumstances suction curettage, abortions, thereby creating an undue burden); Richmond Med'l Center for Women v. Gilmore, 55 F. Supp. 2d 441, 487 (E.D. Va. 1999) (concluding that Virginia's partial birth abortion ban created undue burden because it prohibited D&E abortions); Eubanks v. Stengel , 28 F. Supp. 2d 1024,

30

not and, thus, do not discuss the Act's lack of a health exception or whether its life exception is adequate.

B. Standing, Ripeness and Abstention

Having determined what the Legislature describes as the "central issue in this case" -- the scope of the Act -- we turn our attention to three of the issues which, the Legislature argues, themselves turn on that determination: standing, ripeness and abstention. The Legislature contends that plaintiffs do not have standing to raise their constitutional challenges, that the matter is not ripe for review, and that the District Court should have abstained from evaluating a state statute before it has been interpreted by the state courts. We disagree.

1. Standing

The Legislature contends that plaintiffs lack standing because they do not, by their own admission, perform the D&X procedure, the only method which the Legislature now posits is banned by the Act. Therefore, according to the Legislature, plaintiffs would not sustain any injury were the Act to be enforced.

The District Court found that plaintiffs had standing to challenge the Act because the Act encompasses the conventional methods of abortion plaintiffs currently perform and, thus, they would be exposed to civil liability and license revocation. In addition, the District Court stressed well-established precedent for the proposition that abortion providers have third party standing to assert the rights of their patients in the face of governmental intrusion into the abortion decision in order to determine whether

_____

1035 (W.D. Ky. 1998) (finding Kentucky partial birth abortion ban created undue burden because it prohibited D&E procedure); see also Women's Med'l Prof 'l Corp. v. Voinovich, 130 F.3d 187 (6th Cir. 1997) (holding that statute explicitly prohibiting D&X procedure created undue burden), cert. denied, 523 U.S. 1036 (1998); but see Hope Clinic v. Ryan, 195 F.3d 857 (7th Cir. 1999) (finding no undue burden in partial birth abortion statute, but only after limiting statute to cover only D&X procedure), petition for cert. filed (U.S. Jan. 14, 2000)(Nos. 99-1152, 1156).

such interference would constitute an undue burden. We exercise plenary review over the District Court's determination. See Conte Bros. Automotive, Inc. v. Quaker State-Slick 50, Inc., 165 F.3d 221, 224 (3d Cir. 1998).

In order to meet the constitutional requirements of standing which emanate from Article III of the Constitution, plaintiffs were required to allege and ultimately prove that: (1) they have suffered or imminently will suffer an"injury in fact"; (2) the injury is "fairly traceable" to the defendant's conduct; and (3) the requested relief is likely to redress the injury. Steel Co. v. Citizens for a Better Env't , 523 U.S. 83, 103 (1998); see also Northeastern Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 663-64 (1993).

As we have already discussed in much detail, the Act is so vague as to be impervious to a readily susceptible narrowing construction, effectuating a ban on the conventional types of abortions currently performed by plaintiffs. Given that the Act is not subject to a narrowing construction, it occasions an imminent "injury in fact" upon plaintiffs because, as written, it threatens them with severe civil penalties, namely, license revocation and a $25,000 fine.[10] In addition, plaintiffs have satisfied the

_____

10. The District Court found Planned Parenthood had standing for essentially the same reasons as the plaintiff physicians, i.e. that it provides constitutionally protected abortions which may be disallowed by the broad and vague Act, subjecting it to license revocation. The Legislature asserts that Planned Parenthood does not have standing because no evidence was introduced at the hearing concerning the abortions allegedly performed at Planned Parenthood. See Appellants' Br. at 37 n.18; Reply Br. at 15 n.17. Plaintiffs point to the declaration submitted to the District Court in support of the motion for preliminary restraints certifying that Planned Parenthood is a licensed ambulatory health care facility which performs abortions. See Appellees' Br. at 55 n.28. We need not address this argument, buried within and argued exclusively in footnotes, because it is uncontested that the plaintiff physicians perform abortions and, therefore, at least they have standing to assert the claims. See, e.g., Doe v. Bolton , 410 U.S. 179, 189 (1973) (declining to decide whether additional appellants have standing because "the issues are sufficiently and adequately presented by" appellants with standing).

32

second and third prongs of the standing inquiry: the harm is more than "fairly traceable" to the State's enforcement of the Act, and the requested relief, a permanent injunction, will clearly redress the injury.

Moreover, the District Court correctly concluded that plaintiffs had standing to bring an undue burden challenge on behalf of their patients whose abortion rights were allegedly unconstitutionally impinged. Pointing to the close relationship between a physician and his or her patients, privacy interests, and imminent mootness concerns, the Supreme Court explicitly held that "it generally is appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision[.]" Singleton v. Wulff, 428 U.S. 106, 118 (1976). Indeed, in Casey, where, it should be remembered, the Court first articulated the undue burden standard, the challenge to state abortion restrictions was brought by abortion clinics and physicians who performed abortions on behalf of their patients. See Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833 (1992).

Accordingly, plaintiffs had standing to bring their claims.

2. Ripeness

The Legislature next argues that the challenge to the Act, filed the day the Act was to have become effective and before the Act had been interpreted by the state courts or enforcement agencies, was not ripe for review. Moreover, the Legislature argues, as it did with regard to standing, that if construed narrowly, the Act does not cover the procedures that plaintiffs perform and, thus, there is no danger that it will be enforced against them. The District Court rejected these arguments and found the matters ripe for review. Again, we agree.

Intertwined with Article III's requirement that a party suffer injury or be in danger of imminent injury, is the ripeness doctrine which seeks to "prevent the courts, through the avoidance of premature adjudication, from entangling themselves in abstract disagreements." Artway v. Attorney Gen. of N.J., 81 F.3d 1235, 1246-47 (3d Cir. 1996) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 148

33

(1967), overruled on other grounds, Califano v. Sanders, 430 U.S. 99, 105 (1977)). To determine whether a claim is ripe, a court must weigh: "(1) the hardship to the parties of withholding court consideration; and (2) the fitness of the issues for judicial review." Id. at 1247.

Federal court review is not foreclosed merely because there is a pre-enforcement challenge to a state statute. Indeed, in both Casey and Colautti, the Supreme Court entertained constitutional challenges to state abortion statutes which were filed before the statutes took effect. See, e.g., Casey, 505 U.S. at 845; Colautti v. Franklin, 439 U.S. 379, 383 (1979), overruled in part on other grounds, Webster v. Reproductive Health Servs., 492 U.S. 490 (1989). This matter was ripe for review because there would have been hardship to the parties had review been withheld and the issues were fit for review. With reference to the latter, a comprehensive factual record was amply developed during a four-day hearing, allowing the District Court to fully delineate the legal issues. See Artway, 81 F.3d at 1249 (noting that the "principal consideration" in deciding whether the issue is fit for review is "whether the record is factually adequate to enable the court to make the necessary legal determinations").

With reference to the hardship to the parties of withholding review component of the ripeness test, and as discussed with reference to standing, even though the plaintiffs do not perform the D&X procedure, the threat that the Act would have been enforced against plaintiffs was credible and not speculative. As in the criminal context, "[w]hen the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he `should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.' " Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979) (citation omitted). Similarly, plaintiffs have performed in the past, and intend to perform in the future, concededly constitutionally protected procedures such as the D&E. The Act fairly easily can be read to prohibit those constitutionally protected procedures, and plaintiffs

34

received no assurances that it would not be enforced against them if they performed such procedures. They were entitled to know what they could not do. Cf. Virginia v. American Booksellers Ass'n, Inc., 484 U.S. 383, 393 (1988) (stating that it was "not troubled" by pre-enforcement challenge to state statute because "[t]he State has not suggested that the newly enacted law will not be enforced" and "plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them").

The District Court did not err in finding the challenge to the Act ripe for review.[11]

3. Abstention

The Legislature argues that the District Court should have but did not abstain pursuant to Railroad Comm'n of Tex. v. Pullman Co., 312 U.S. 496 (1941). Essentially, the argument goes, the District Court should not have undertaken to analyze the Act under the United States Constitution because the Act has not yet been interpreted by the New Jersey courts. According to the Legislature, interpretation of the Act by the state courts, the courts empowered to render binding interpretations of state statutes, could significantly narrow the scope of the Act, thereby eliminating, or at least limiting, the scope of the federal constitutional concerns raised here. While on its face the Act may seem ambiguous, the Legislature continues, New Jersey courts frequently perform "judicial surgery" to narrowly interpret statutes to relieve constitutional concerns. The doctrine of Pullman abstention, the Legislature concludes, dictates that the state courts be given the opportunity to do just that before a federal court swoops in and strikes down a statute.

The District Court carefully considered whether it should abstain under Pullman and concluded that abstention was not warranted because the Act was so vague that it was not

_____

11. The Legislature's contention that the matter is not ripe for review because a federal court should not attempt to decipher a state statute without the benefit of interpretation by the state courts is better framed as an argument for abstention and will be addressed in our discussion of abstention.

35

susceptible to a state court interpretation which would render unnecessary, or substantially limit, the federal constitutional question. See Verniero, 41 F. Supp. 2d at 488-90. Yet once again, we agree.

The obligation of a federal court to adjudicate claims which fall within its jurisdiction has been deemed by the Supreme Court to be "virtually unflagging." New Orleans Pub. Serv., Inc. v. Council of City of New Orleans , 491 U.S. 350, 359 (1989) (citations omitted). It has long been said that "[federal courts] have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the Constitution." Id. at 358 (quoting Cohens v. Virginia, 6 Wheat. 264, 404 (1821)). This is because "Congress, and not the Judiciary, defines the scope of federal jurisdiction within the constitutionally permissible bounds." Id. at 359.

Abstention is an "extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it" and one which should be invoked "only in the exceptional circumstances." Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 813 (1976) (citation omitted); see also City of Houston v. Hill, 482 U.S. 451, 467 (1987) (stating that "[a]bstention is, of course, the exception and not the rule"); Marks v. Stinson, 19 F.3d 873, 881 (3d Cir. 1994) (same); City of Pittsburgh, 757 F.2d at 45 (same).

One type of abstention, commonly referred to as Pullman abstention, applies "in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law." Colorado River, 424 U.S. at 814 (citation omitted). In other words, abstention under Pullman "is appropriate where an unconstrued state statute is susceptible of a construction by the state judiciary`which might avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially change the nature of the problem.' " Bellotti v. Baird, 428 U.S. 132, 147 (1976) (citation omitted). The purpose of abstaining is twofold: (1) to avoid a premature constitutional adjudication which could ultimately be displaced by a state court adjudication of state law; and (2) to avoid "needless friction

with state policies." Pullman, 312 U.S. at 500. While these are compelling considerations, we reiterate that Pullman abstention should be rarely invoked. See Artway , 81 F.3d at 1270 (recognizing that Pullman abstention is an "exception to the general rule that federal courts must hear cases properly brought within their jurisdiction").

Before a federal court may abstain under Pullman , three "exceptional circumstances" must be present. First, there must be "uncertain issues of state law underlying the federal constitutional claims." Presbytery of N.J. of the Orthodox Presbyterian Church v. Whitman, 99 F.3d 101, 106 (3d Cir. 1996), cert. denied, 520 U.S. 1155 (1997). Second, the state law issues must be amenable to a state court interpretation which could "obviate the need to adjudicate or substantially narrow the scope of the federal constitutional claim." Id. Third, it must be that "an erroneous construction of state law by the federal court would disrupt important state policies." Id.  If all three circumstances are present, the District Court is then required to determine, in the Court's discretion,"whether abstention is appropriate by weighing such factors as the availability of an adequate state remedy, the length of time the litigation has been pending, and the impact of delay on the litigants." Artway, 81 F.3d at 1270.

We agree with the District Court that, even though the state courts have not had the opportunity to interpret the Act, all of the "exceptional circumstances" requisite for Pullman abstention are simply not present. Arguably inherent in plaintiffs' vagueness challenge to the Act is that there is an uncertain question of state law, namely, what procedures are covered by the Act. The Supreme Court has explicitly held, however, that "not every vagueness challenge to an uninterpreted state statute or regulation constitutes a proper case for abstention." Procunier v. Martinez, 416 U.S. 396, 401 (1974), overruled on other grounds, Thornburgh v. Abbott, 490 U.S. 401 (1989). In any event, we need not reach the first and third "exceptional circumstances" because it is clear that the second circumstance is not present in this case.

At the risk of redundancy, the Act is so vague that it is not amenable to a state court interpretation which would

37

render unnecessary or substantially narrow the constitutional question at issue. Cf. Colautti , 439 U.S. at 392 n.9 (refusing to abstain from deciding vagueness challenge to abortion regulation because of "the extent of the vagueness that afflicts [the statute]"). We have previously noted a leading commentator's observation that the Supreme Court's "amenability" standard establishes a "fairly high threshold requiring a `substantial possibility' that a state interpretation would obviate the need for a federal constitutional decision." Artway, 81 F.3d at 1271 n.34 (citing to Erwin Chemerinsky, Federal Jurisdiction 692–93 (1994)). "If the statute is not obviously susceptible of a limiting construction, then even if the statute has `never [been] interpreted by a state tribunal . . . it is the duty of the federal court to exercise its properly invoked jurisdiction.' " Hill, 482 U.S. at 468 (quoting Harman v. Forssenius, 380 U.S. 528, 535 (1965)).

Abstaining to allow the New Jersey state courts to interpret the Act would be fruitless because those courts, even applying "judicial surgery," are not empowered to completely rewrite statutes. See Hamilton Amusement Ctr., 156 N.J. at 280 (holding that New Jersey courts may use " `judicial surgery' to excise a constitutional defect" but the statute must be "reasonably susceptible to such a construction"). For the same reasons that we will not rewrite the Act, we have every confidence that the New Jersey courts would likewise refuse to do so and would likely say that it is up to the Legislature to take the Act back and do it over.

Given how vast the reach of the Act and how vague and ambiguous its terms, the entire Act is permeated with defects of constitutional dimension, defects "judicial surgery" could not cure without a total rewrite. There is, in other words, nothing to "excise" but the Act itself. As we have discussed throughout this opinion, and it bears repetition one last time, the Act could reasonably be interpreted to prohibit most conventional abortion procedures. As such, it provides little guidance to physicians who are attempting to tailor their conduct to avoid the Act's prohibitions, performance of which could strip them of their professional licenses. No narrowing

38

construction has even been suggested by the Legislature, aside from its conclusory assertion that the Act covers only the D&X procedure, an assertion completely unsupported by the Act itself. Moreover, given the numerous meanings that could be attributed to the Act's terms, as well as the inherent uncertainty of terms such as "substantial portion," the Act is simply not susceptible to, much less, readily susceptible to, a limiting reading by any court, much less a reading which would bring it within the confines of the Constitution. Because the Act cannot be reasonably interpreted to obviate or substantially narrow the federal constitutional question, the second exceptional circumstance required for Pullman abstention is lacking.

Not only are all of the requisite exceptional circumstances absent, but equitable considerations, such as the effect of delay on the litigants or the public interest, also weigh against abstention. Cf. Chez Sez III Corp. v. Township of Union, 945 F.2d 628, 633–34 (3d Cir. 1991) ("When a facial challenge is involved, abstention is generally not appropriate because `extensive adjudications, under a variety of factual situations, [would be required to bring the statute] within the bounds of permissible constitutional certainty[.]' ") (quoting Baggett v. Bullitt, 377 U.S. 360, 378 (1964)), cert. denied, 503 U.S. 907 (1992). Unsure of what conduct the statute encompasses, physicians would cease performing conventional abortions such as D&Es for fear of running afoul of the Act. Thus, if the federal court were to abstain while cases brought under the Act wend their way through the state courts, the rights of women to obtain constitutionally protected abortions would be chilled. Moreover, such limitations on the abortion procedures available to women could have dramatic and irreversible health risks to pregnant women. See, e.g., Verniero, 41 F. Supp. 2d at 502 (detailing health risks attendant to women forced to carry pregnancies to term such as liver or kidney disease, severe hypertension, cardiac conditions, diabetes, blindness or self-harm due to exacerbated schizophrenia).

The Supreme Court's discussion in Baggett is illuminating. In Baggett, state employees challenged a Washington statute requiring loyalty oaths as being unconstitutionally vague. See Baggett v. Bullitt , 377 U.S.

39

360, 361 (1964). The District Court abstained and dismissed the case, holding that adjudication was inappropriate in the absence of a state court interpretation of the statute as state court interpretation might resolve the constitutional issues. See id. at 366. The Supreme Court reversed. It pointed out that, unlike in other cases in which vagueness was a concern, the Baggett plaintiffs "cannot understand the required promise, cannot define the range of activities in which they might engage in the future, and do not want to foreswear doing all that is literally or arguably within the purview of the vague terms." Id. at 378. As such, the Court opined, "[i]t is fictional to believe that anything less than extensive adjudications, under the impact of a variety of factual situations, would bring the oath within the bounds of permissible constitutional certainty." Id. Abstention, it concluded, "does not require this." Id.

Likewise, in this case, physicians cannot understand what conduct is permissible or prohibited under the Act. Because the Act is subject to multiple interpretations and can encompass numerous procedures, extensive adjudication in the state courts would be necessary to clarify the Act and narrow its scope even assuming, with little or no confidence, that that could be done at all. In the meantime, physicians would drastically limit their abortions practices to avoid the reach of the Act and a woman's constitutional right to obtain an abortion would be impermissibly chilled. See Hill, 482 U.S. at 467-68 (noting that "to force the plaintiff who has commenced a federal action to suffer the delay of state-court proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect") (quoting Zwickler v. Koota, 389 U.S. 241, 252 (1967)). The District Court did not abuse its discretion when it refused to abstain. 12

_____

12. On November 19, 1999, the Supreme Court of New Jersey adopted Rule 2:12A permitting the Court of Appeals for the Third Circuit to certify questions of state law to the Supreme Court of New Jersey. Rule 2:12A became effective on January 3, 2000. See Notice to the Bar: Rule Adopted on Certification of Questions of Law, 8 N.J. Lawyer 2560 (Dec. 6, 1999). While the Legislature brought this rule to the attention of the Court in a letter submitted pursuant to Fed. R. App. P. 28(j), it did not

40

specifically request that this Court utilize the rule, nor did it set forth
proposed questions for certification or argue why certification would be appropriate in this case.

In any event, certification would be fruitless in light of the multiple problems which permeate the Act. As the Supreme Court in Hill opined when the possibility of certification was raised,"[a] federal court may not
properly ask a state court if it would care in effect to rewrite a statute."
Id. at 471.

13. Given this disposition, we need not reach plaintiffs' arguments that the Act discriminates against women in violation of the Equal Protection Clause and that the Act does not serve a legitimate state interest.
IV. CONCLUSION

For the foregoing reasons, we will affirm the judgment of the District Court.13

41

ALITO, Circuit Judge, concurring in the judgment.

I do not join Judge Barry's opinion, which was never necessary and is now obsolete. That opinion fails to discuss the one authority that dictates the result in this appeal, namely, the Supreme Court's decision in Stenberg v. Carhart, 2000 WL 825889 (U.S. June 28, 2000). Our responsibility as a lower court is to follow and apply controlling Supreme Court precedent. I write briefly to explain why Carhart requires us to affirm the decision of the District Court in this case. This is an appeal by the New Jersey State Legislature from a decision of the United States District Court for the District of New Jersey holding the New Jersey Partial-Birth Abortion Ban Act of 1997, 2A:65A-5 et seq., unconstitutional and permanently enjoining enforcement of the Act. Planned Parenthood of Central New Jersey v. Verniero, 41 F. Supp. 2nd 478 (D.N.J. 1998). The New Jersey statute closely resembles statutes enacted in recent years in many other states.

On January 14, 2000, the Supreme Court granted certiorari to review the decision in Carhart v. Stenberg, 192 F.3d 1142 (8th Cir. 1999), cert. granted, 120 S.Ct. 865 (2000), which presented the question of the constitutionality of a similar Nebraska statute. The Supreme Court recently held that the Nebraska statute is unconstitutional. Stenberg v. Carhart, 2000 WL 825889 (U.S. June 28, 2000).

The Court based its decision on two grounds. First, in Part II-A of its opinion, the Court held that the Nebraska law is unconstitutional because it lacks an exception for the preservation of the health of the mother. See 2000 WL 825889, *9-*14. Second, in Part II-B of its opinion, the Court held that the Nebraska statute is unconstitutional because it imposes an undue burden on a woman's ability to choose the method most commonly used for second trimester abortions, the "dilation and evacuation" (D & E) method. See 2000 WL 825889, *14-*18.

Under Carhart, the decision of the District Court must be affirmed. First, the New Jersey statute, like its Nebraska counterpart, lacks an exception for the preservation of the health of the mother. Without such an exception, the New Jersey statute is irreconcilable with Part II-A of Carhart.

42

Second, the Supreme Court's holding in Part II-B of Carhart is also applicable here. As noted, in that portion of its opinion, the Court held that the Nebraska statute applied, not only to the "dilation and extraction" or D & X procedure, but also to the more commonly used D & E procedure. The wording of the relevant provisions of the Nebraska statute is nearly identical to that of the New Jersey statute. Thus, the Supreme Court's holding in Part II-B of its opinion in Carhart must be regarded as controlling in this case.

In light of this interpretation of the New Jersey statute, the Legislature's argument that the plaintiffs lack standing must fail. As noted above, the New Jersey statute must be interpreted, in light of Carhart, as applying to the D & E procedure, and the plaintiff physicians in this case perform that form of abortion. The Legislature's argument that this case is not ripe because the New Jersey statute has not been authoritatively interpreted by the state courts or state enforcement officials must also fail. In view of the interpretation in Carhart, there is no reason to wait for interpretation by state officials or judges.

In a post-Carhart filing, the New Jersey Legislature has urged us to certify questions concerning the interpretation of the New Jersey statute to the state supreme court. In Carhart, however, the Supreme Court of the United States turned down a similar request for certification by the Attorney General of Nebraska. 2000 WL 825889, *18. The decision of the Supreme Court of the United States to deny certification in Carhart must be regarded as controlling here, both with respect to the Legislature's request for certification and with respect to its closely related argument that the District Court erred in refusing to abstain pursuant to Railroad Commission v. Pullman Co. , 312 U.S. 496 (1941).

In conclusion, Carhart compels affirmance of the decision of the District Court.

A True Copy:
Teste:

    Clerk of the United States Court of Appeals
    for the Third Circuit

43